Commonwealth *v.* Bulted, Appellant.

Submitted January 5, 1970; argued December 2, 1970. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

*John D. DiGiacomo,* Assistant Public Defender, for appellant.

*Charles H. Spaziani,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE O'BRIEN, July 15, 1971:

On May 25, 1968, at about 11:50 p.m., appellant, Samuel Bulted, entered the Bethlehem, Pennsylvania, police headquarters and, according to witnesses, told an officer, "I shot and killed my wife." A detective was sent to the Bulted residence where he discovered the body of appellant's wife, Francesca Bulted, lying on the floor with her head propped up against the dresser. There was blood on her dress and the right side of her face was completely blown away. A twelve-gauge shotgun shell was found lying on the bed, and a gun, later

identified as belonging to appellant, was found in the bedroom.

After trial in November, 1968, appellant was convicted of first degree murder. After dismissal of his post-trial motions for new trial and arrest of judgment, appellant was sentenced to life imprisonment.

At trial, in addition to the facts outlined above, the Commonwealth offered the following evidence: Testimony of Mr. Atahoalpa Rodriguez, friend of appellant, who testified that on the evening of May 25, 1968, the appellant had asked him to drive him to police headquarters. While driving to headquarters, appellant had told Mr. Rodriguez, "I caught my wife with somebody else, and I want you to take me down to Headquarters"; testimony of a physician that the autopsy he performed showed that the bullet which killed appellant's wife had entered in the back of her neck and had traveled at a slightly upward angle to the front where it exited; evidence that the bullet had then traveled through a window of the Bulted home into a shingle in a home sixty-five feet away, where a rifle slug was found, together with a piece of shingle fragment at the base of that home; testimony of Juana Nieves, the decedent's sister, who stated that earlier in the evening of May 25, she and her mother has gone to the Bulted residence, where they had seen Mrs. Bulted crying. After appellant refused to permit them to enter they had gone home. Shortly after 11:00 p.m., appellant had gone to the Nieves' home, where, after getting the keys to his wife's car, he had told Miss Nieves, "You may go and get your sister. . . ." It was then that Miss Nieves had found her sister's body; evidence from Mrs. Francesca Camacho, the decedent's mother, that she had heard her son-in-law, the appellant, threaten her daughter prior to May 25, 1968, and that her daughter had told her that appellant used to hit her. The Commonwealth also offered into evidence a blood-stained green sport shirt

and underwear jersey, owned by the appellant, which were found in the bedroom where the body was discovered. A Pennsylvania State Police chemist testified that he had found human blood on the clothing, but he had not sought to identify what type blood it was. The district attorney hypothesized that the blood was the victim's and had splattered on the defendant after he had shot her. On the basis of this evidence, the jury found appellant guilty of murder in the first degree, and he was sentenced to life imprisonment.

The appellant, taking the stand in his own defense, gave his own account of the events which led to his wife's death, wholly different from the Commonwealth's hypothesis. His version follows:

Appellant and his wife had been married for six years. They had been living in Bethlehem, where he had been employed as a laborer on the night shift with Bethlehem Steel Company. He had come home from work on the morning of May 25, 1968, and after sleeping for a few hours, he had left at 11:00 in the morning to go fishing. When he returned, he had gone to his mother-in-law's home to ask his wife to return home to fix dinner. She had refused, saying she had to go shopping. He then went home, changed his clothes and returned to his mother-in-law's home at approximately 6:30 p.m. He again asked his wife to go home to make dinner, but she again said she had to go shopping. He persuaded her to go home. However, fifteen minutes after Mrs. Bulted served her husband dinner, she informed him that she had to take her sister shopping. He asked her why she had to go shopping all the time, and whether she was sure she wasn't going to meet Francisco. She did not reply, so he drove her to her sister's and she promised to return from shopping at 11:00.

Appellant then testified that he went to a grocery store, where he stayed approximately ten minutes.

Thereafter, he saw his sister-in-law's car coming down the street with his wife driving. As they passed, his sister-in-law stuck out her tongue at him. He testified that he waited for five minutes and then got in his car and drove to Allentown. When he got there, he noticed his sister-in-law's car parked in front of a Spanish restaurant. A man, who was talking to the girls in the car, got in the car and drove off. Then appellant followed them to the parking lot at a shopping center, where he found his sister-in-law's car. He saw a couple embracing and kissing and the man had one hand on the woman's private parts. When he got closer, appellant recognized the woman to be his wife. He testified that he opened the car door, the man looked and his wife jumped to one side.

Appellant then testified that a fight ensued. He punched his wife's companion in the nose, he was kicked in the lip. Then both men were on the ground wrestling. His wife intervened, the other man escaped and appellant and his wife drove home. During the twenty-minute drive back to Bethlehem, appellant and his wife argued about her relationship with the other man. He asked her why she was still seeing Francisco after she had promised appellant she wouldn't see him again. She answered, telling appellant that she didn't love him and didn't want him.

Appellant next related that when he got home he took his shirt off because it was full of blood from the fight with Francisco (the same shirt offered into evidence by the Commonwealth, which had hypothesized, without analyzing the blood, that the blood was that of the decedent). Once again, he and his wife argued, she telling him that she didn't love him and that he was not the father of their child. According to appellant, this verbal battle was momentarily interrupted by the arrival of Mrs. Bulted's mother and sister. Appellant testified that he told them he had "caught [his wife]

with Francisco again." His sister-in-law replied, telling him: "How long you know she's running around with this guy, with Francisco?- You're a sucker. You keep living with her for how long? You are living with her, and you know that for a long time, and you know she is going to have a baby that ain't yours."

After his in-laws left, appellant's wife told him she felt like killing him. He asked why, and she again told him that she didn't love him. After reminding her that he was Catholic and perhaps would be unable to get a divorce, appellant promised that they could see a lawyer on Monday to explore the possibility of a divorce. Then, according to appellant, he went upstairs. Soon after his wife followed, carrying a gun. As he was leaving the bathroom, she jumped into the bedroom with the gun in her hands, telling appellant that she was going to kill him. He testified that he slapped a shell which she was holding from her hand, put his hand on the gun, and started wrestling with her to get the gun. He testified that while they were wrestling, the gun went off and his wife was killed. Francisco Matos did not appear at the trial, having left the city shortly after Mrs. Bulted's death. However, his deposition, taken subsequent to trial, by an assistant district attorney and defense counsel, corroborates appellant's testimony as to his intimate relations with appellant's wife and his fight with appellant.

The district attorney in his summation to the jury said, "I don't believe Francesca Bulted ran around with anybody, but if she were going to run around, and if she were a married woman who was nine months' pregnant, would she take three witnesses with her to see some phantom named 'Francisco'? That's a phantom. Whoever heard of Francisco? They pick out a name 'Francisco' with no last name, and they say, 'Here's the culprit who caused this problem.' " He later said, "As I have said, the only type of defense is to

prosecute the victim. There is no 'Francisco',—he is not here, he has never been here. Nobody else was ever confronted by him; he is a phantom conjured up to try to deviate from the direct line of justice in this courtroom."

When this case was first submitted, appellant argued that the district attorney's closing remarks were grounds for reversal because the district attorney knew that Francisco Matos was a real person, not a phantom. If it were true that the district attorney deliberately represented to the jury that Francisco Matos was not a real person, at a time when he knew this was not the case, we would agree with appellant. Such highly prejudicial statements could not be condoned if they knowingly conflicted with the truth. However, the district attorney has stated that neither he nor his men could find Francisco Matos or any people who knew him, and, therefore, he reasonably believed, at the time of trial, that Farncisco Matos was a product of appellant's imagination. We have accepted the district attorney's word, and, therefore, the nature of his closing remarks is not *per se* an issue in this case. Consequently, since we find no merit to appellant's other allegations of trial error, there is only one issue in this case. Is appellant entitled to a new trial because of afterdiscovered evidence in the form of the deposition of Francisco Matos?

In *Commonwealth v. Mount*, 435 Pa. 419, 257 A. 2d 578 (1969), we quoted our opinion in *Commonwealth v. Schuck*, 401 Pa. 222, 229, 164 A. 2d 13 (1960), where we stated the law on the subject of after-discovered evidence: "In order to justify the grant of a new trial on the basis of after-discovered evidence, the evidence must have been discovered after the trial and must be such that it could not have been obtained at the trial by reasonable diligence, must not be cumulative or merely impeach credibility, and must be such as would

likely compel a different result." The parties seem to agree that the Matos deposition meets the first part of the test laid down in *Schuck,* in that neither appellant's family, appellant's attorney, nor the district attorney's office could locate Mr. Matos, because, as Matos later admitted, he had fled Allentown for Philadelphia because of his fears of Mrs. Bulted's brothers.

The Commonwealth argues, however, that Mr. Matos's testimony was merely corroborative of appellant's testimony, and would, therefore, not likely compel a different result. We disagree. The emphasis which the district attorney placed on the supposed "phantom" nature of Francisco Matos in his closing remarks is indicative of the crucial importance which Francisco Matos and his supposed nonexistence played in the case presented by the Commonwealth. It would be unfair for the Commonwealth to have it both ways: first, to take advantage of the alleged nonexistence of Francisco Matos, and now to argue that whether Francisco Matos exists and backs up appellant's story is irrelevant. Significantly, the jury was told to ask, in evaluating the credibility of a story: "Was their testimony corroborated by other testimony in the case, or was it contradicted by other testimony in the case?"

In addition, the Commonwealth offered into evidence appellant's blood-stained sport shirt and undershirt, theorizing that the blood on these shirts was that of the victim which had splattered on appellant after he shot her. The deposition of Francisco Matos indicates that at a second trial, the Commonwealth would have difficulty making this argument, because Francisco Matos's deposition indicates that there was, in fact, a fight between him and appellant, from which blood splattered.

When we further consider the great discretion given to a jury to choose among the various degrees of homicide, we believe that a second trial would be likely to

produce a different result, even if the jury refused to believe any part of appellant's case other than that testified to by Francisco Matos. The jury would only have to take heed of the court's charge in light of appellant's testimony, as now corroborated by Francisco Matos, to arrive at a different verdict, even if they found that appellant's wife died because he pulled the trigger rather than because the gun went off accidentally, after she threatened to kill him. As the court correctly charged in part:

"Thus the law requires, and the jury must find the actual intent, that is to say, the fully formed purpose to kill, with so much time for deliberation and premeditation as to convince the jury that this purpose was not the immediate offspring of rashness or impetuous temper, and that the mind had become fully conscious of its own design. . . .

"Being sometimes a wilful act, as the term 'voluntary' connotes, it is necessary that the circumstances should take away every evidence of cold depravity of heart or wanton cruelty; therefore, to reduce an intentional wounding resulting in death to voluntary manslaughter, there must be a sufficient cause of provocation and a state of rage or passion or fear, without time to cool, placing the defendant beyond the control of his reason and suddenly impelling him to do the deed. . . .

". . . This term 'passion' as here used in such anger, rage, sudden resentment or terror as renders the mind incapable of cool reflection, or to obscure temporarily the reason of the person affected. The sudden passion which will reduce an unlawful killing from murder to voluntary manslaughter must be due to a legally adequate provocation.

"In that connection, it has been said that the law views with some tolerance an unlawful act impelled by a justifiably passionate or fearful heart, but has no

toleration whatever for an unlawful act impelled by a malicious heart."

Under the circumstances, it would be montrously unjust to deny appellant a second trial at which the jury will have an opportunity to weigh the testimony of Matos before reaching their verdict.

Judgment of sentence reversed and new trial granted.

Mr. Chief Justice BELL dissents.

Mr. Justice COHEN took no part in the decision of this case.