J-S92021-16

2017 PA Super 288

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| RAYMOND DALE PAYNE | |
| Appellant | No. 604 WDA 2016 |

Appeal from the PCRA Order April 13, 2016
In the Court of Common Pleas of Erie County
Civil Division at No(s): 2562 of 1976

BEFORE:  SHOGAN, J., MOULTON, J., and STRASSBURGER, J.[*]

DISSENTING OPINION BY MOULTON, J.:          **FILED SEPTEMBER 7, 2017**

I respectfully dissent.  Because I believe Appellant has sufficiently established that the outcome of his degree-of-guilt hearing would likely have been different based on the new DNA evidence, I would reverse and remand for a new degree-of-guilt hearing.

This is a difficult case that requires us to address the burden of a petitioner seeking PCRA relief based on exculpatory evidence not available at the time of trial.  While I agree with much of the majority's analysis, particularly that the evidence was sufficient to convict Appellant of first-degree murder, I do not share the majority's confidence that the new DNA evidence would not change the outcome of the proceedings.  Because I

_____

[*] Retired Senior Judge assigned to the Superior Court.

believe the DNA evidence seriously undermines the theory of the case advanced by the prosecution at the degree-of-guilt hearing, and because that theory was fully embraced by the factfinder, I believe Appellant is entitled to a new degree-of-guilt hearing.

There is no doubt that Appellant was responsible for the victim's death. Appellant confessed to much of the conduct alleged by the prosecution and pled guilty to the general charge of murder. While Appellant admitted some culpability, however, he did not admit to intentionally killing the victim. His contention at the degree-of-guilt hearing, therefore, was that he was not guilty of first-degree murder but only of third-degree murder.

In contrast, the prosecution's theory at the degree-of-guilt hearing was that Appellant was guilty of first-degree murder because, with premeditation and deliberation, he intentionally killed the victim while she resisted his sexual assault. This theory was premised on two key pieces of evidence: (1) forensic evidence of seminal fluid found in the victim's vaginal and rectal areas; and (2) the testimony of Commonwealth witness Anthony Lee Evans, to whom Appellant allegedly confessed to strangling the victim in the course of sexually assaulting her.

The trial court, sitting as factfinder at the degree-of-guilt hearing, relied on both pieces of evidence in finding that Appellant intentionally killed the victim:

> **[T]here is verification for Evans' testimony that [the victim] died protesting a sexual attack upon her**. Paul R. Daube, a chemist employed by the Pennsylvania State Police[,] testified that he conducted tests on [h]emorrhogic fluids extracted from the victim's vaginal and anal areas. He stated that he found the presence of seminal acid phosphatase in both areas and that seminal acid phosphatase is found only in semen.
>
> In the opinion of the court the accidental theory advanced by the defense lacks credibility. **It is our belief that the testimony of Evans is more consistent with the established facts than the self[-]serving statement of [Appellant]**.
>
> The specific intent to kill which is necessary to constitute murder in the first degree may be found from the circumstances surrounding the slaying together with all reasonable inferences therefrom.
>
> In this case not only do the circumstances point to the conclusion that the slaying of [the victim] was wil[l]ful, deliberate and premeditated, **but [Appellant's] admission to [Evans] verifies that conclusion and removes all doubt**.
>
> **The testimony before the court is also consistent with a slaying in the perpetration of a forceful rape** which would constitute murder in the second degree. However, having concluded that [Appellant] is guilty of an intentional killing, we need not further pursue the theory of felony murder.

Trial Ct. Op., 7/18/77, at 6-7 (emphases added; internal citation omitted).

Thirty-eight years later, however, DNA testing conclusively established that Appellant was **not** the contributor of the seminal fluid recovered from the victim's body. As a result, Appellant sought PCRA relief based on this after-discovered evidence.

The issue before this Court is whether the DNA evidence excluding Appellant as the contributor of the seminal fluid requires a new degree-of-guilt hearing under 9543(a)(2)(vi) of the PCRA, which provides:

> (a) To be eligible for relief under this subchapter, the petitioner must plead and prove by a preponderance of the evidence . . . :
>
> (2) That the conviction or sentence resulted from . . . :
>
> . . .
>
> (vi) The unavailability at the time of trial of exculpatory evidence that has subsequently become available and would have changed the outcome of the trial if it had been introduced.

42 Pa.C.S. § 9543(a)(2)(vi); *see id.* § 9543.1(f)(3). To succeed on an after-discovered evidence claim, the "petitioner must prove that (1) the evidence has been discovered after trial and it could not have been obtained at or prior to trial through reasonable diligence; (2) the evidence is not cumulative; (3) it is not being used solely to impeach credibility; and (4) it would likely compel a different verdict." *Commonwealth v. Cox*, 146 A.3d 221, 228 (Pa. 2016) (internal quotation omitted).

Thus, to determine whether Appellant is entitled to a new degree-of-guilt hearing under section 9543(a)(2)(vi), we must decide whether Appellant has established by a preponderance of the evidence: (1) that the DNA evidence is exculpatory; and (2) if so, that the DNA evidence would

likely have changed the outcome of his degree-of-guilt hearing.[1]  I believe Appellant has met his burden with respect to both elements.

As to the first element, the majority concludes that the DNA evidence is not "exculpatory" because it does not prove Appellant's innocence of first-degree murder.  Maj. Op. at 15.  The majority finds that the DNA evidence would exculpate Appellant **only** if he had been convicted of a sexual offense.  *Id.*  I cannot agree.

This Court addressed what constitutes exculpatory evidence under section 9543(a)(2)(vi) in *Commonwealth v. Bonaccurso*, 625 A.2d 1197 (Pa.Super. 1993).  In that case, Bonaccurso, who had been convicted of first-degree murder, sought PCRA relief based on after-discovered evidence, in the form of eyewitness testimony, that Bonaccurso's shooting of the victim was accidental.  *Id.* at 1198.  We determined that the evidence was exculpatory because, if believed, it would support a third-degree, rather than a first-degree, murder conviction:

> When we consider whether granting Bonaccurso a new trial was an error of law we must decide whether the evidence was unavailable, whether it is exculpatory, and whether it would affect the outcome of the trial.  The first question is easily disposed of.  [The witness] left the scene and lied to the police about whether he had seen any of that day's events.  He was unavailable.  **Whether the evidence is exculpatory is also straightforward. Bonaccurso's and [the witness's] version of the**

---

[1] As the majority points out, it is undisputed that the DNA evidence was not available at the time of trial and is neither cumulative nor being used solely to impeach credibility.  *See* Maj. Op. at 11 n.2.

- 5 -

> **events, if believed, paints a picture of third-degree murder, not first-degree.** When a defendant is found guilty of third-degree murder, that verdict implies a verdict of not guilty on the charge of first-degree murder. **Therefore, testimony which would make more likely than not a change in degree from first to third is exculpatory.**

*Id.* at 1200 (emphases added). We further concluded that the evidence would likely affect the outcome of the trial because if the witnesses were to "testify at trial as they did at the PCRA hearing, it would be difficult for the Commonwealth to prove the premeditation and lack of provocation which a conviction for first-degree murder would require." *Id.* at 1201. Therefore, we reversed the PCRA court's order and remanded for a new trial.

Here, the majority ignores both the prosecution's theory of the case, which shaped the conduct of the 1977 degree-of-guilt hearing, and the impact of the new DNA evidence on that theory. At the hearing, the prosecution argued, and the trial court accepted, that the presence of seminal fluid, presumed to be Appellant's, was proof of the intent required for a first-degree murder conviction. This theory was bolstered by Evans' testimony that Appellant admitted killing the victim while perpetrating a sexual assault. The trial court specifically credited Evans' testimony, finding it "[t]he most damaging" to Appellant and "more consistent with the established facts" than Appellant's "accidental theory," which did not account for the presence of seminal fluid in the victim's body. Trial Ct. Op., 7/18/77, at 5-6. According to the trial court, the seminal fluid "verifi[ed] . . . Evans' testimony that [the victim] died protesting a sexual attack upon her" and

- 6 -

"remove[d] all doubt" about the required premeditation for first-degree murder. *Id.* at 6.

In my view, the new DNA evidence excluding Appellant as the contributor of the seminal fluid is exculpatory because it creates the possibility of reasonable doubt regarding his *mens rea* at the time of the murder. The evidence directly contradicts, though it does not completely disprove, the key inference on which the prosecution and the trial court relied to convict Appellant of first-degree murder – that the victim died while resisting Appellant's sexual attack. The evidence also calls into question Evans' credibility and supports Appellant's position that the killing was not intentional. *Cf. Bonaccurso*, 625 A.2d at 1200.[2]

I also disagree with the majority's conclusion that Appellant has not met his burden of proving, by a preponderance of the evidence, that the DNA evidence would likely have changed the outcome of his degree-of-guilt hearing. Contrary to the Commonwealth's assertion on appeal, the record shows that the sexual assault evidence was central to the prosecution's case. Three of the four Commonwealth witnesses discussed the evidence, and the prosecutor emphasized it during his closing argument.[3] *See* N.T.,

_____

[2] Were the factfinder to conclude that the killing was not intentional, Appellant could only be subject to liability for either second- or third-degree murder.

[3] The prosecutor stated: "[A]ll of the words from [Appellant] are consistent with the fact that this was an intentional killing; that at least it
*(Footnote Continued Next Page)*

6/7/77, at 15-16, 20-21, 44-45, 56-57; N.T., 6/28/77, at 17. More critically, the trial court explicitly relied on the sexual assault evidence in convicting Appellant of first-degree murder. *See* Trial Ct. Op., 7/18/77, at 6-7. Under these circumstances, I cannot conclude that DNA evidence would not have resulted in a different verdict.

Two cases are instructive on this point. In ***Commonwealth v. Bulted***, 279 A.2d 158, 159 (Pa. 1971), a jury convicted Bulted of first-degree murder for the shooting of his wife. At trial, Bulted testified that the gun discharged accidentally during an altercation with his wife about her sexual relationship with another man, Francisco Matos. Matos did not appear at trial because the parties could not locate him. ***Id.*** at 160-61. The prosecution relied heavily on Matos's non-appearance, claiming that he was a "phantom" witness. ***Id.*** at 161. After trial, however, Bulted located and deposed Matos, and Matos's testimony corroborated Bulted's trial testimony regarding Matos's relationship with Bulted's wife. ***Id.***

On appeal, our Supreme Court held that this evidence warranted a new trial because "[t]he emphasis which the district attorney placed on the supposed 'phantom' nature of Francisco Matos in his closing remarks is indicative of the crucial importance which Francisco Matos and his supposed

*(Footnote Continued)* ─────────

was a rape, that the facts of the case show that there was intercourse between the two." N.T., 6/28/77, at 17.

non[-]existence played in the case presented by the Commonwealth." *Id.* at 161-62. The Supreme Court explained:

> **When we further consider the great discretion given to a jury to choose between the various degrees of homicide, we believe that a second trial would be likely to produce a different result, even if the jury refused to believe any part of [Bulted's] case other than that testified to by Francisco Matos.** The jury would only have to take heed of the court's charge in light of [Bulted's] testimony, as now corroborated by Francisco Matos, to arrive at a different verdict, even if they found that [his] wife died because he pulled the trigger rather than because the gun went off accidentally, after she threatened to kill him. . . .
>
>                    . . .
>
> Under the circumstances, it would be monstrously unjust to deny [Bulted] a second trial at which the jury will have an opportunity to weigh the testimony of Matos before reaching their verdict.

*Id.* at 162 (emphasis added).

In ***Commonwealth v. Fiore***, 780 A.2d 704, 708 (Pa.Super. 2001), a jury convicted Fiore of criminal conspiracy to commit murder and criminal solicitation. Fiore subsequently sought PCRA relief based on the after-discovered testimony of co-defendant Nikolai Zdrale, who was deposed 13 years after the alleged conspiracy. *Id.* at 712. At his deposition, Zdrale testified that he and Fiore, while they disliked the victim, did not conspire to murder him. *Id.*

On appeal, this Court found that despite minor inconsistencies in Zdrale's testimony, his testimony directly contradicted that of two Commonwealth witnesses, one of whom was a convicted perjurer and the

other of whom admitted lying to police. *Id.* at 713. In concluding that Zdrale's testimony would likely produce a different verdict, we examined the impact of such testimony on the prosecution's theory of the case at the time of trial:

> Mr. Zdrale's testimony contradicts the Commonwealth's case-in-chief. At trial, the Commonwealth contended that Mr. Zdrale was the middleman in the murder-for-hire conspiracy. He was the link between Mr. Fiore, the person who wanted [the victim] killed, and Mr. Smith and Mr. Thomas, the men hired to kill [the victim]. Mr. Zdrale professed that there was no conspiracy. We believe that a jury should be presented with the testimony of Mr. Zdrale to permit it to determine whether his version of the events is more credible than that of Mr. Smith and Mr. Thomas.

*Id*. at 714. Therefore, we concluded that Fiore "proved by a preponderance of the evidence that . . . [Zdrale's] testimony[,] if believed by a jury[,] would likely have changed the outcome of the trial." *Id.*; *see also Bonaccurso*, 625 A.2d at 1201 n.3 ("It is demonstrable that had the defense known of the [newly-discovered] evidence . . . [,] the trial tactics would have changed.").

In this case, the prosecution's theory of the case, and the conduct of Appellant's degree-of-guilt hearing, almost certainly would have been different had the DNA evidence been available in 1977. A factfinder should be given the opportunity to weigh the DNA evidence along with the other available evidence before determining Appellant's appropriate degree of guilt.

Accordingly, I would conclude that the DNA evidence excluding Appellant as the contributor of the seminal fluid found in the victim's body requires a new degree-of-guilt hearing and, therefore, would reverse the PCRA court's order.

For these reasons, I respectfully dissent.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/7/2017