427 A.2d 1356

**COMMONWEALTH of Pennsylvania**

**v.**

**James F. YOUNGKIN, Appellant.**

Superior Court of Pennsylvania.

Argued March 19, 1980.

Filed Jan. 5, 1981.

Reargument Denied April 24, 1981.

Petition for Allowance of Appeal Denied Nov. 30, 1981.

Richard A. Sprague, Philadelphia, for appellant.

Gailey C. Keller, District Attorney, Bloomsburg, for Commonwealth, appellee.

Before PRICE, CAVANAUGH and WATKINS, JJ.

PRICE, Judge:

Following a jury trial commenced on May 16, 1977, appellant, a physician, was convicted of involuntary manslaughter [1] of Barbara Fedder, his patient. Post-trial motions were denied and appellant was sentenced to a term of imprisonment of one to three years, fined $5,000 and ordered to pay the costs of prosecution. For the reasons stated herein, we affirm the judgment of sentence.

On appeal, appellant raises numerous contentions. Asserting that the Commonwealth did not produce sufficient evidence to support his conviction, appellant first contends that the Commonwealth failed to sustain its burden of proving direct causation between his acts and the death of the decedent, the element of recklessness or gross negligence, and failed to overcome the presumption of innocence. Our review of the record convinces us that the evidence produced was sufficient to support appellant's conviction.

In evaluating the sufficiency of the evidence, the test is whether, viewing the evidence in the light most favorable to the Commonwealth and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Waldman*, 484 Pa. 217, 398 A.2d 1022 (1979); *Commonwealth v. Santiago*, 476 Pa. 340, 382 A.2d 1200 (1978). We are mindful, in this evaluation, that the trier of fact, while passing upon the credibility of witnesses and the weight to be accorded the evidence produced, is free to believe all, part, or none of the evidence. *Commonwealth v. Waldman, supra.*

The pertinent facts are as follows. Barbara Fedder, a seventeen-year old patient of appellant, lapsed into a state of unconsciousness while attending a party on the night of

1. 18 Pa.C.S. § 2504.

July 23, 1976. Attempts at cardiopulmonary resuscitation proved unsuccessful, and Ms. Fedder was pronounced dead during the early morning hours of July 24. The cause of death was determined to be asphyxiation from aspiration of the contents of her stomach due to depression of her gag reflex. Simply stated, Ms. Fedder suffocated when the contents of her stomach entered her lungs. Normally, one's gag reflex would expel the regurgitated material. However, in Ms. Fedder's case, her gag reflex was depressed. Post-mortem laboratory analyses performed on the decedent revealed the presence of the drugs amobarbital and secobarbital, components of a chemical compound known as Tuinal, a barbiturate prescribed as a hypnotic or sleeping pill. Medical and toxicological experts for the Commonwealth testified that the depression of Ms. Fedder's gag reflex was caused by ingestion of the barbiturate. Further Commonwealth evidence revealed that in the seven weeks preceding Ms. Fedder's death appellant prescribed numerous drugs for her, including seven prescriptions for Tuinal, the last of which was written July 23, 1976.

The Commonwealth charged appellant with involuntary manslaughter, alleging that, as a direct result of the reckless and grossly negligent manner in which he prescribed the drug Tuinal he caused the death of Ms. Fedder. Involuntary manslaughter is defined in the Crimes Code as follows:

> "A person is guilty of involuntary manslaughter when as a direct result of the doing of an unlawful act in a reckless or grossly negligent manner, or the doing of a lawful act in a reckless or grossly negligent manner, he causes the death of another person." 18 Pa.C.S. § 2504.

Although tort concepts of causation are inapplicable in criminal homicide prosecutions and thus a conviction requires a more direct causal connection, *see Commonwealth v. Root*, 403 Pa. 571, 170 A.2d 310 (1961); *Commonwealth v. Howard*, 265 Pa.Super. 535, 402 A.2d 674 (1979), a defendant's acts need not be the direct cause of death for criminal responsibility to be imposed. If the acts contributed in producing

the ultimate result of death, they may be considered the legal cause of the victim's death. This point was explicated by our supreme court in *Commonwealth v. Skufca,* 457 Pa. 124, 321 A.2d 889 (1974), *appeal dismissed, Skufca v. Pennsylvania,* 419 U.S. 1028, 95 S.Ct. 510, 42 L.Ed.2d 304 (1974), as follows:

"Although we have expressly rejected the tort theory of causation in assessing criminal responsibility, it has never been the law of this Commonwealth that criminal responsibility must be confined to a sole or immediate cause of death. Criminal responsibility is properly assessed against one whose conduct was a direct and substantial factor in producing the death even though other factors combined with that conduct to achieve the result. Here the substantial relation between appellant's conduct which constituted the misdemeanor, and the deaths of her children satisfies the causation requirement. Although suffocation due to the fire was the immediate medical cause of the children's death, appellant's unlawful conduct in leaving them locked in the room, without supervision, for several hours, susceptible to numerous forseeable dangers, was the legal cause of their death. The fire produced its fatal result only because of the defenseless position the young victims were left in through their mother's unlawful conduct." *Id.,* 457 Pa. at 132–33, 321 A.2d at 894 (citations omitted).

*See also Commonwealth v. El,* 255 Pa.Super. 597, 389 A.2d 138 (1978). Furthermore, actions have been held to constitute the legal cause of a homicide if they started a "chain of causation" which lead to the death of the victim. *See Commonwealth v. Cheeks,* 423 Pa. 67, 223 A.2d 291 (1966).

■ In the instant case, death was caused by aspiration of the regurgitated contents of the stomach due to a depressed gag reflex. The jury found that the depression of the gag reflex was caused by ingestion of the drug Tuinal, prescribed to the decedent by appellant. Our review of the record supports the jury's finding that the drug Tuinal caused Ms. Fedder's demise. Dr. Robert Hunter, the pathol-

ogist for Berwick Hospital who performed the post-mortem examination of Ms. Fedder, testified that he believed her gag reflex was depressed from the barbiturates present in her system, and this postulation was seconded by Wellon Collom, a toxologist who performed the laboratory tests on sample tissues and serums taken from the decedent. Mr. Collom testified that the specimens taken were tested for the presence of all prescription drugs and several non-prescription drugs including morphine. The only drugs found present in the decedent's body were amobarbital and secobarbital, the components of Tuinal. No traces of alcohol were discovered. Mr. Collom also testified that the levels of amobarbital and secobarbital discovered in the specimen taken from the decedent were of a sufficient degree of concentration to effectuate depression of Ms. Fedder's gag reflex. On the basis of this evidence, we conclude that the jury's finding that ingestion of Tuinal led to Ms. Fedder's death is sufficiently supported by the record.

 However, the mere finding that the decedent died from ingestion of a drug prescribed to her by appellant is insufficient, in itself, to support a conviction for involuntary manslaughter. Prescription of a controlled drug by a licensed physician does not constitute an unlawful act. Therefore, under the Crimes Code, the Commonwealth must prove that appellant executed this lawful act, *i. e.* prescription, in a reckless or grossly negligent manner and that his conduct was the legal cause of Ms. Fedder's death.

 The recklessness or criminal negligence required to sustain an involuntary manslaughter conviction may be found if the accused consciously disregarded or, in gross departure from a standard of reasonable care, failed to perceive a substantial and unjustifiable risk that his action might cause death or serious bodily harm. *See Commonwealth v. Agnew*, 263 Pa.Super. 424, 398 A.2d 209 (1979); 18 Pa.C.S. §§ 302(b)(3), 302(b)(4). Evidence produced at trial indicated that during the months of June and July, 1976, appellant issued to the decedent seven separate prescriptions

for the compound Tuinal,[2] the latest of which was issued on July 23, 1976. Testimony adduced at trial indicated that Ms. Fedder had in her possession on the night of the party a bottle containing the July 23 prescription.

The Coroner of Columbia County, Dr. D. Ernest Witt, testified that the size of the Tuinal pills prescribed by appellant (3 grains) was double the normal pill size and that it was questionable practice to prescribe Tuinal to an out-patient. Regarding the instant fact situation, the coroner stated that prescribing Tuinal to a seventeen year old girl in the amounts and frequencies evidenced by appellant's prescriptions was "over-prescribing," "considerably irresponsible and reckless" and "totally wrong." N.T. 214, 233–34). The Deputy Coroner of Columbia County, Dr. Frederick B. Clemens, concurred in Dr. Witt's assessment and termed the practice dangerous, with fatal results a possibility.

The Commonwealth also produced testimony from nine pharmacists who described the dozens of prescriptions for controlled substances which appellant had issued to Ms. Fedder in the months preceding her death. One of the pharmacists testified that the decedent came into his store on one occasion, about a month before her death, in such a dazed and stuporous condition that she had to hold onto the cash register to maintain her balance. Leery of selling the decedent a prescription that would enhance her stuporous state, the pharmacist telephoned appellant, described to him Ms. Fedder's condition, and queried whether it was advisable to fill the prescription in those circumstances. Appellant's response to the pharmacist was "fill the damn thing." (N.T. 183).

Our review of the evidence leads us to the conclusion that there was sufficient evidence to prove each element of involuntary manslaughter. The evidence indicates that appellant prescribed Tuinal to the decedent in quantities and frequencies termed irresponsible and totally inappropriate in

2. In addition, during this same period of time, appellant prescribed to the decedent the controlled drugs valium (a tranquilizer), dalmane (a hypnotic or sleeping pill) and dexamyl (an amphetamine).

the circumstances. The frequency with which the prescriptions were written should have suggested that the decedent was abusing Tuinal. Moreover, this fact was specifically brought to appellant's attention by a pharmacist who called appellant alarmed over the decedent's physical condition. However, appellant chose to ignore these indications of abuse and continued to prescribe the drug to decedent. In these circumstances the record supports and justifies the jury's conclusion that appellant consciously disregarded a substantial and unjustifiable risk, which disregard involved a gross deviation from the standard of conduct a reasonable person would have observed.

The record also supports the jury's finding that appellant's acts were a direct and substantial factor in producing Ms. Fedder's death. Appellant recklessly overprescribed Tuinal to decedent over the course of several months, he was aware of her abuse of the drug yet took no remedial measures, and her death was attributed to asphyxiation due to a depressed gag reflex caused by ingestion of Tuinal.

■ Appellant posits that the decedent's consumption of marijuana on the night of her death was an intervening act that placed her in a position of risk and "destroy[ed] [the] requirement of directness prescribed by the manslaughter statute." (Appellant's Brief at 14). He supports this proposition by directing our attention to the case of *Commonwealth v. Kominsky*, 240 Pa.Super. 532, 361 A.2d 794 (1976).

Conflicting expert testimony was presented in the instant case concerning the effects of marijuana on barbiturates. Pathologist Robert G. Hunter testified that marijuana would not physiologically depress the respiratory system. Conversely, a defense witness testified that regular users of marijuana experience, in time, a reduction in efficiency of the respiratory system possibly hindering one's efforts to clear aspired material. It was for the jury to judge credibility and the weight to be accorded each expert's testimony and we will not question that determination on appeal.

In *Kominsky,* the defendant, a physician, was charged with involuntary manslaughter when he abandoned a female companion while she was sleeping in a parked car attempting to recover from the apparent effects of alcohol. Unbeknownst to the defendant, the victim, in reality, not only consumed a large quantity of alcohol, but also ingested an overdose of a depressant drug. In upholding the trial court's decision to grant the defendant's motion in arrest of judgment, we noted that evidence was adduced that indicated that ingestion of the drug was itself sufficient to cause death and thus concluded that the defendant's act was not such a radical departure from the standard of conduct of the reasonable person as to constitute recklessness, since he could reasonably have believed that she was merely intoxicated.

Unlike *Kominsky,* no evidence was adduced in the instant case indicating that other drugs were found in the decedent's body which would either enhance the effect of Tuinal or constitute an independent cause of death. Moreover, appellant was or should have been aware that abuse of Tuinal had potentially fatal effects and that the decedent was indeed abusing the drug. In this light we conclude that the record adequately supports the jury's finding that appellant's conduct was a direct and substantial factor in producing the death of Ms. Fedder.

Appellant next contends that he was denied a fair trial because of numerous alleged prejudicial remarks made by the prosecutor in his closing arguments. Prior to examining the challenged remarks seriatim, we briefly note the applicable law in this area.

It has often been observed that the prosecuting attorney in a criminal case occupies a peculiarly sensitive position as both an officer of the court seeking justice and as a agent of the state attempting to assure effective law enforcement. *Commonwealth v. Starks,* 479 Pa. 51, 387 A.2d 829 (1978); *Commonwealth v. Collins,* 462 Pa. 495, 341 A.2d 492 (1975); *Commonwealth v. Guess,* 266 Pa.Super. 359, 404 A.2d 1330 (1979). In recognizing this singular station and

the influence it might exert on the jury, the appellate courts of this Commonwealth have been careful to scrutinize the trial transcript for prosecutorial comments prejudicial to an accused. Nevertheless, we have always recognized that not every intemperate or uncalled for remark by the prosecutor requires a new trial. *Commonwealth v. Jarvis*, 482 Pa. 598, 394 A.2d 483 (1978); *Commonwealth v. Perkins*, 473 Pa. 116, 373 A.2d 1076 (1977). Rather, "[t]he language must be such that its 'unavoidable effect would be to prejudice the jury forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict.'" *Commonwealth v. Stolzfus*, 462 Pa. 43, 61, 337 A.2d 873, 882 (1975), *quoting Commonwealth v. Simon*, 432 Pa. 386, 394, 248 A.2d 289, 292 (1968). Moreover, the effect of such remarks is largely dependent upon the atmosphere at trial, *Commonwealth v. Mikesell*, 475 Pa. 589, 381 A.2d 430 (1977); *Commonwealth v. Dickerson*, 406 Pa. 102, 176 A.2d 421 (1962); *Commonwealth v. Reynolds*, 254 Pa.Super. 454, 386 A.2d 37 (1978), and the proper action to be taken, upon objection, is within the discretion of the trial court. *Commonwealth v. Jarvis, supra; Commonwealth v. Stolzfus, supra; Commonwealth v. Silvis*, 445 Pa. 235, 284 A.2d 740 (1971). Finally, when the cumulative effect of any improper remarks so prejudices the jury as to prevent a fair trial, reversible error exists. *Commonwealth v. Simon, supra; Commonwealth v. Reynolds, supra.*[3] Consequently, we

3. Section 5.8 of the A.B.A. Standards Relating to the Prosecution Function provides:

"(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.

(d) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict."

must determine the prejudicial effect of the following remarks.

Appellant first objects to a number of remarks made by the district attorney in his summation,[4] which remarks appellant argues improperly disparaged his counsel's trial strategy. Shortly after commencing the closing argument, the prosecutor observed that:

"It has been my experience as District Attorney that defense counsel have a habit and a theory that because the burden rests upon the Commonwealth to prove the defendant's guilt beyond a reasonable doubt that the more confusing and the more smoke they can create in the minds of you, the Jury, the more chance that some doubt may creep into your deliberations. I submit to you that that is exactly the tactics or strategy that Mr. Lipschitz [appellant's counsel] employed in the defense of this defendant, to create as much confusion and as much smoke as possible, and to disregard the undisputed facts." (N.T. 552–53).

Toward the end of the argument, the prosecutor stated:

"As I say, I listened to Mr. Lipschitz's closing remarks, and there is no way I can match his eloquence, but I thought to myself that really the crux of his defense in this case is filled with smoke and confusion, and I ask you to do away with that smoke and confusion. His other thrust is that of sympathy." (N.T. 565).

Appellant argues that the district attorney's repeated use of the terms "smoke" and "confusion" constituted a deliberate attack on the defense strategy in an effort to belittle the defense, thus preventing a determination of appellant's culpability based on a disinterested and impartial assessment of the evidence developed at trial.

In *Commonwealth v. Cherry*, 474 Pa. 295, 378 A.2d 800 (1977), our supreme court summarized its recent holdings in

4. In addition to those portions of the closing argument quoted in the text, the prosecutor made four other references to appellant's counsel creating "more smoke" and "confusion." (N.T. at 553, 554, 563 and 564).

the area of prejudicial comments made in the course of closing argument.

> "This Court has established that the conduct of the prosecutor at closing argument is circumscribed by the concern for the right of a defendant to a fair and impartial trial. We have held that a prosecutor's expression of personal opinion regarding a defendant's guilt, credibility, or strategy is prejudicial and amounts to reversible error. We have also held that improper statements of the evidence and references to what the victim might have said are improper." *Id.,* 474 Pa. at 301–02, 378 A.2d at 803 (footnotes omitted).

Thus, in *Commonwealth v. Collins, supra,* the prosecutor's comment to the jury that the defense was setting up a "smoke screen" was found improper, and in *Commonwealth v. Gilman,* 470 Pa. 179, 368 A.2d 253 (1977), the supreme court condemned the prosecutor's statements wherein he described defense counsel's strategy as an attempt to "becloud the issue," "deceive" the jury, and "sneak out" with a lesser verdict. Similarly, in *Commonwealth .v. Long,* 258 Pa.Super. 312, 392 A.2d 810 (1978), we held that the prosecutor exceeded the permissible boundaries of argument when he accused the defendant of trying to "sneak out of [the] Courtroom under the cover of smoke." Appellant now argues that the district attorney's comments in the case *sub judice* were, by virtue of their close similarity to the remarks deemed improper in *Collins, Gilman,* and *Long,* prejudicial *per se* and, therefore, constituted reversible error. We disagree.

We have previously recognized that "although per se rules perform a valuable function in numerous areas of the law, such a shorthand approach is largely inappropriate in the evaluation of prosecutorial misconduct." *Commonwealth v. Guess, supra,* 266 Pa.Super. at 370, 404 A.2d at 1335. A careful reading of *Collins, Gilman* and *Long* reveals that no *per se* rule was adopted with respect to the remarks resembling those complained of instantly. Rather, the comments disapproved in those cases were found prejudicial as unwarranted attacks on defense strategy only *in combination with*

other highly inflammatory statements by the prosecutor.[5] Put another way, in each of those cases the remarks condemned as disparaging defense counsel's trial strategy constituted only a small portion of an otherwise unduly prejudical closing address. In our view, the instant case is readily distinguishable from *Collins, Gilman,* and *Long,* for nowhere in the district attorney's summation is there language as intemperate and inflammatory as that employed in those cases.

5. In *Commonwealth v. Collins,* 462 Pa. 495, 341 A.2d 492 (1975), the prosecutor told the jury in referring to various defense witnesses, "I don't know which liar you want to believe." He described for the jury the type of death the victim must have suffered, and although the defendant was on trial for murder, the prosecutor repeatedly referred to the defendant's occupation as a heroin pusher. Furthermore, he described the crime as a "classic, vicious, violent first-degree murder," and told the jury that they had to have the "courage" to say "yes" to a verdict of first degree murder. He then asked to jury to "let the message go out into the community that the citizens which we all are will not put up with 'this kind of viciousness and violence.'" Finally, he informed the jury that as a prosecutor he was usually able to feel some sympathy or pity for a defendant, but in that case he was unable to do so.

In *Commonwealth v. Gilman,* 470 Pa. 179, 368 A.2d 253 (1977), the prosecutor stated directly in his summation that the defendant was a "a coldblooded killer," and described him as "cunning," "sly," "calculating," and "deceiving." He then told the jury that the defendant had fled to North Carolina and had five days to "connive, to concoct the story, and this is the story that he came up with, an incredible story to try to justify that cold blooded brutal murder . . . ." The defendant was described as having "beat that girl viciously, broke her neck . . . beat her like a dog . . . . he beat her until there were no more groans and moans coming out of that human body." Finally, the prosecutor made direct reference to the fact that the deceased victim was unable to testify against the defendant.

In *Commonwealth v. Long,* 258 Pa.Super. 312, 392 A.2d 810 (1978), the prosecutor implied that defense counsel was under no duty to operate under the truth and described defense counsel as a "not guilty machine." He questioned the veracity of a defense witness, stating, "I doubt very seriously whether or not this incident occurred." Finally, he asked the jury to "[t]hink about the larger issue here . . . the fact that any male or female of any size, shape or color can ride the subway at 4:00 a. m. or 4:00 p. m. if they like in safety without fear." We note that in *Long,* Judge Cercone concluded that not only were the remarks improper, but "*in combination,* they were unduly prejudicial" and "*cumulatively* worked to adversely affect the right of the defendant to a fair trial." *Id.,* 258 Pa.Super. at 318, 320, 392 A.2d at 813, 814 (emphasis added).

Furthermore, after careful scrutiny of the record, we do not believe that the prosecutor's various comments regarding "smoke" and "confusion" *by themselves* so inflamed the passion and prejudices of the jury or distracted and misled the jury as to warrant a new trial. Those cases holding that the prejudice engendered by the prosecutor's comments required reversal have done so on the basis of strong or abusive language. *See, e. g., Commonwealth v. Joyner*, 469 Pa. 333, 365 A.2d 1233 (1976); *Commonwealth v. Lipscomb*, 455 Pa. 525, 317 A.2d 205 (1974); *Commonwealth v. Reynolds, supra.* The remarks complained of in this record, while questionable, were neither so strong nor abusive that their unavoidable effect, individually or cumulatively, was to unduly influence the jury so that they could not fairly weight the evidence and render a true verdict. *Commonwealth v. Simon, supra; Commonwealth v. Guess, supra.*

Appellant next challenges the following portions of the district attorney's closing address:

> "[T]his defendant, as all defendants who come before this Court, is charged with a crime against people, citizens not only in the community, but the entire State of Pennsylvania .... [T]he Commonwealth would ask, ladies and gentlemen, that you return a verdict of guilty as charged." (N.T. 566–67).

Appellant contends that in such close proximity, these two statements amounted to an appeal to the jury's community spirit and prejudice, thereby directing the jury to go beyond the evidence and identify themselves as victims of this particular crime. While artfully presented, we are not persuaded by appellant's argument.

 A prosecutor is not precluded from arguing, within the bounds of propriety, for law and order, and in making such an argument may remind the jury of the dangers inflicted upon the community by certain criminality. *Commonwealth v. Feiling*, 214 Pa.Super. 207, 252 A.2d 200 (1969); *Commonwealth v. McHugh*, 187 Pa.Super. 568, 145 A.2d 896 (1958). Nor are members of the jury foreclosed from recognizing their role as citizens. *Commonwealth v.*

*Lee,* 261 Pa.Super. 48, 395 A.2d 935 (1978). It is only when the jurors are asked to place themselves in the unfortunate circumstances of the victim or are otherwise encouraged to divert their attention from the evidence before them in favor of their own sympathies or fears, that the argument exceeds the bounds of propriety. *See, e. g., Commonwealth v. Cherry, supra; Commonwealth v. Harvell,* 458 Pa. 406, 327 A.2d 27 (1974); *Commonwealth v. Long, supra.* The remarks complained of instantly fall considerably short of such a prejudicial play to the emotions of the jury and thus do not warrant a new trial.

Appellant further contends that in his summation the prosecutor materially misstated certain evidence presented in the case. The first misstatement to which appellant alludes occurred when the district attorney told the jury, "it is totally uncontradicted that the cause of Barbara Fedder's death was the ingestion of the drug Tuinal." (N.T. 554). Several moments later he remarked, "I submit to you that the cause of death is uncontradictory. Barbara Fedder died as a result of the ingesting or swallowing of too many Tuinal capsules." (N.T. 556). Appellant argues that the district attorney's use of the terms "uncontradicted" and "uncontradictory" wholly ignored the testimony of several expert witnesses that the quantity of Tuinal detected in Ms. Fedder's body was insufficient to constitute a lethal dose, thereby misleading the jury on the critical issue of cause of death. We disagree. It is evident from a careful reading of the prosecutor's closing argument that he did not ignore the conflicting testimony regarding the level of Tuinal in the decedent's system. Shortly after he referred to the decedent's cause of death as "uncontradicted," the district attorney told the jury:

"Ladies and gentlemen, much has been made about the fact that the quantity of Tuinal in Barbara Fedder's system after her death *was or was not* in a lethal range. *I think you realize by now that this matter is in dispute,* but I think you also realize that it was not necessary that she consume enough Tuinal to cause her to stop breathing;

she took enough Tuinal to prevent her from coughing up her vomit. Ladies and gentlemen, I submit that it was the swallowing of the Tuinal that prevented her from coughing up her vomit and ultimately resulting [sic] in her death." (N.T. 555) (emphasis added).

In light of this comment it can hardly be maintained that the district attorney materially misled the jury as to the cause of Ms. Fedder's demise. Consequently we find no prejudice resulting from the prosecutor's use of the terms "uncontradicted" and "uncontradictory." [6]

▮ Appellant further alleges that the district attorney misstated the evidence when, in reviewing the evidence on the issue of recklessness, he told the jury:

"You will note that on May 26, 1976, there were prescribed by this defendant to Barbara Fedder 30 Tuinal, three grains. You will recall that Dr. Clemens told you that in his opinion that is a double strength dose; there were thirty of them on May 26, 1976. Then you will recall that on the 2nd of June, 1976, Barbara Fedder was taken to the emergency room at the Berwick Hospital because of a suspected overdose of drugs. You will recall that Dr. Clemens said that it is standard practice at the Berwick Hospital that a copy of that report is placed in the family doctor's mailbox in the hospital, and that he, the family doctor, would receive it the following day. *Let's assume that he didn't get it until the 4th of June though.* On the 4th of June, he prescribed an additional 20 three grain Tuinal." (N.T. 560–61) (emphasis added).

Claiming that there was no evidence, direct or circumstantial, that he ever received the emergency room report of Ms. Fedder's overdose, appellant asserts that in making the emphasized comment the district attorney overstepped the

---

**6.** We have previously held that a prosecutor's use of the phrase "uncontradicted evidence" did not have the unavoidable effect of prejudicing the jury or forming in their minds a fixed bias or hostility toward a defendant such that they could not fairly weigh the evidence and render a true verdict. *Commonwealth v. Olivencia*, 265 Pa.Super. 439, 451, 402 A.2d 519, 525 (1979). *Cf. Commonwealth v. Davis*, 452 Pa. 171, 305 A.2d 715 (1973) (persistent use of terms "uncontroverted" and "uncontroverted facts" held prejudicial).

limits of permissible argument and argued to the jury a fact not in evidence.

Our review of the record indicates that the remark complained of was a legitimate inference drawn from evidence adduced at trial. Dr. Clemens twice testified, without objection, that when an emergency room report is prepared at Berwick Hospital, it is the hospital's policy and standard procedure that a copy of the report be placed in the hospital mailbox of the patient's family physician. He further testified that if the procedure had been followed in the instant case, a copy of the emergency room report concerning Ms. Fedder's overdose would have been placed in appellant's mailbox on or about June 3, 1976. Thus, the evidence described the hospital's customary practice with respect to such reports, but it did not conclusively establish whether this particular emergency room report was placed in appellant's hospital mailbox. In such circumstances, the question of whether this particular report was placed in appellant's mailbox was one of fact for the jury. *See Paul v. Dwyer,* 410 Pa. 229, 188 A.2d 753 (1963); *Verecchia v. DeSiato,* 353 Pa. 292, 45 A.2d 8 (1946); *Campbell v. Royal Indemnity Co. of New York,* 256 Pa.Super. 312, 389 A.2d 1139 (1978); *Christie v. Open Pantry Food Marts, Inc. of Delaware Valley,* 237 Pa.Super. 243, 352 A.2d 165 (1975). If the jury determined that the hospital's procedure was followed and that a copy of the report was placed in appellant's mailbox, the logical and, in this case, probative inference to be drawn from such a fact would have been that appellant received the report on or about June 3, 1976. As the evidence legitimately suggested such an inference, it was proper for the district attorney to call it to the jury's attention in the course of his closing address.

Finally, appellant asserts that the prosecutor impermissibly expressed his personal opinion of appellant's guilt when he stated:

"I say to you, ladies and gentlemen, that the Commonwealth has proven beyond not just a reasonable doubt, but beyond the shadow of a doubt that Barbara Fedder—and

Mr. Lipschitz objected to me calling her child—but a female, seventeen years of age, died on the night of July 23rd or early morning hours of July 24th from swallowing too many Tuinal pills, and that those Tuinal pills that she swallowed were the ones that were irresponsibly prescribed to her by this defendant." (N.T. 563).

Appellant's counsel failed to object to these statements, however. Consequently, the claim has not been preserved for appellate review.[7] *Commonwealth v. Jarvis, supra; Commonwealth v. Blair*, 460 Pa. 31, 331 A.2d 213 (1975).

 Appellant next contends that the trial court erred in admitting into evidence certain testimony that was highly prejudicial and wholly irrelevant. He first asserts that the testimony of several of the decedent's friends regarding the manner in which appellant conducted Ms. Fedder's office visits was immaterial and extremely inflammatory, as the testimony implied that appellant exacted favors from his female patients in the form of kisses, hugs, photographs and other untoward conduct in exchange for prescriptions. By permitting the introduction of this testimony, appellant argues that the trial court effectively placed his moral turpitude in issue, thus preventing the jury from making an unbiased assessment of his guilt. We cannot agree. The trial judge specifically advised the jury during his charge that appellant was not on trial for "moral purposes" and that they should not allow their moral assessment of appellant to prejudice their determination of his culpability. (N.T. 590). This cautionary instruction focused the jury's attention on their proper role and thus minimized any prejudice generated by the introduction of the challenged testimony.

 Appellant further maintains that he is entitled to a new trial because the trial court erred in permitting the Commonwealth, through its pharmacist witnesses, to intro-

7. Appellant's counsel did object to the portion of the quoted statement wherein the prosecutor said, "and Mr. Lipschitz objected to me calling her child." (N.T. 570). However, we detect no prejudice engendered by the district attorney's comment.

duce the prescription history of various drugs prescribed by appellant for Barbara Fedder during the seven months preceding her death in July, 1976. He argues that evidence of prescriptions for drugs other than Tuinal was irrelevant to the crime charged and should have been excluded and, furthermore, that any prescriptions other than those written in the several days immediately preceding Ms. Fedder's death were too remote in time to be relevant. This argument is without merit.

The prescription history presented by the Commonwealth was undoubtedly relevant to the task of establishing appellant's course of conduct toward Ms. Fedder. The logical and probative inference to be drawn from the challenged evidence was that in the months prior to the decedent's death, appellant repeatedly overprescribed drugs capable of abuse to Ms. Fedder, thus demonstrating an ongoing disregard for her legitimate medical needs. In our view, there was a direct and logical connection between appellant's prior actions with respect to Ms. Fedder and the crime charged, for the prior actions revealed a prescription practice that was decidedly reckless and dangerous and led, ultimately, to Ms. Fedder's demise. Furthermore, while it is undoubtedly the rule in this Commonwealth that evidence of prior criminal acts is inadmissible against a defendant at his trial on another charge, *see, e. g., Commonwealth v. Stanley*, 484 Pa. 2, 398 A.2d 631 (1979); *Commonwealth v. Martin*, 479 Pa. 63, 387 A.2d 835 (1978); *Commonwealth v. Colon*, 264 Pa.Super. 314, 399 A.2d 1068 (1979), exceptions to the rule exist where the prior criminal acts are so closely related to the crime charged that they show motive, intent, malice, identity or a common plan, scheme or design. *Commonwealth v. Spruill*, 480 Pa. 601, 391 A.2d 1048 (1978); *Commonwealth v. Rose*, 265 Pa.Super. 159, 401 A.2d 1148 (1979). Instantly, we believe the exception for common plan, scheme, or design is apposite, since appellant's actions, while perhaps not evidencing a "plan" or "scheme," are indicative of an ongoing

course of conduct with respect to the decedent. Accordingly, there was no abuse of discretion in the admission of the prescription history.[8]

Appellant next contends that the Commonwealth improperly denied him access to certain statements of Commonwealth witnesses, which statements were "of crucial importance ... in the preparation of his defense." (Appellant's Brief at 31). Specifically, defense counsel requested discovery of statements given by three of Barbara Fedder's friends during police interviews conducted several days after Ms. Fedder's death. The statements obtained during the interviews were subsequently reduced to writing by the officers investigating the incident. Appellant filed an Application for Discovery on April 11, 1977, and, pursuant to that application, a conference was held in the chambers of the trial judge on May 3, 1977, approximately one week prior to the commencement of appellant's trial. At the conference, each police report of witness interviews was reviewed in the presence of appellant's counsel, who was advised of any material in the reports that might be favorable to appellant. No subsequent hearing on the discovery application was held. Immediately prior to the start of trial, again in chambers, defense counsel renewed his request to examine any statements obtained from Ms. Fedder's friends. Following a lengthy discussion, the trial judge refused to direct the district attorney to turn over any statements and noted defense counsel's exception. (N.T. 19, 21). Appellant now argues that discovery should have been compelled under

8. Appellant also claims the trial court erred in admitting, over objection, certain portions of the testimony given by the Commonwealth's expert medical witnesses, Drs. Witt and Clemens, wherein they testified as to the manner in which they, personally, would have treated patients in circumstances similar to those in the instant case. Appellant argues that such testimony was irrelevant and prejudicial since it reflected only the personal idiosyncrasies and biases of the two physicians. However, after reviewing the physicians' testimony in its entirety, it is abundantly clear that their opinions were premised upon applicable standards of medical practice and were, therefore, relevant.

then-applicable Pa.R.Crim.P. 310 [9] or, alternatively, mandated by the holding in *Commonwealth v. Grayson*, 466 Pa. 427, 353 A.2d 428 (1976). We disagree with both contentions.

■ Appellant claims that he was entitled to discovery of the statements under Rule 310 because at the conference in chambers just prior to trial his counsel offered clear proof of "exceptional circumstances and compelling reasons" justifying disclosure. However, his argument ignores the final sentence of Rule 310 specifically prohibiting the trial court from ordering pretrial discovery or inspection of written statements of witnesses in the possession of the Commonwealth. Accordingly, appellant had no right to pretrial discovery of the statements under Rule 310.

■ Nor do we believe that *Commonwealth v. Grayson, supra* compels a different result. In *Grayson*, our supreme court held that the trial court erred in rejecting defense counsel's request to examine three witness' pretrial statements *for the purpose of cross-examination*. "The defense was entitled to examine the statement of the witnesses in order to have a fair opportunity to cross-examine the witnesses." *Id.*, 466 Pa. at 429, 353 A.2d at 429. Implicit in the court's holding in *Grayson* is the proposition that the proper time for a defense request that the Commonwealth furnish a witness' pretrial statement is *after* the witness has testified on direct examination. Appellant would have us extend

**9.** Pa.R.Crim.P. 310, in effect at the time of appellant's trial, has since been amended by our supreme court. *See* Pa.R.Crim.P. 305, effective January 1, 1978. Rule 310 provided:

"All applications of a defendant for pretrial discovery and inspection shall be made not less than five days prior to the scheduled date of trial. The court may order the attorney for the Commonwealth to permit the defendant or his attorney, and such persons as are necessary to assist him, to inspect and copy or photograph any written confessions and written statements made by the defendant. No other discovery or inspection shall be ordered except upon proof by the defendant, after hearing, of exceptional circumstances and compelling reasons. The order shall specify the time, place and manner of making discovery or inspection and may prescribe such terms and conditions as are necessary and proper. *In no event, however, shall the court order pretrial discovery or inspection of written statements of witnesses in the possession of the Commonwealth.*" (Emphasis added).

*Grayson* and hold that an accused is entitled to obtain and inspect the prior statements of Commonwealth witnesses at *any* time during trial. We perceive no basis in the law for the validity of appellant's premise, *see Commonwealth v. Hamm*, 474 Pa. 487, 495, 378 A.2d 1219, 1223 (1977); *Commonwealth v. Kontos*, 442 Pa. 343, 349, 276 A.2d 830, 832–33 (1971), and, therefore, find no error in the trial court's denial of defense counsel's requests.

Appellant next claims the trial court erred in refusing to instruct the jury on the meaning of supervening cause, thereby rendering the charge to the jury insufficient as a matter of law and depriving him of a fair trial. We cannot agree. Reviewing the elements of involuntary manslaughter, the trial judge clearly and adequately informed the jury that to find appellant guilty, they must find, *inter alia*, that Ms. Fedder's death was the direct result of an act of appellant. Furthermore, he told the jury that they were to consider whether Ms. Fedder's conduct in any way diminished appellant's responsibility with respect to the legal cause of death. Examining the trial court's charge in its entirety, we are satisfied that the instructions adequately covered the alternative theories of causation available under the facts of the instant case.[10]

Finally, appellant contends that the sentencing court abused its discretion by imposing a sentence that was manifestly excessive. Following his sentencing on March 22, 1979, appellant timely filed a petition for reconsideration on March 30, 1979, *see* Pa.R.Crim.P. 1410, which motion was denied by the court below on April 26, 1979. Accordingly, appellant's challenge to the propriety of his sentence has been preserved for review.

Generally, the sentence imposed by the court of common pleas is left undisturbed on appeal for the reason that the trial court is in a far better position than an

---

10. We note, moreover, that at the close of his charge the trial judge asked counsel for both sides for additions and corrections, at which time defense counsel expressed satisfaction with the court's coverage on the issue of causation.

appellate court to weigh the factors involved in determining a proper sentence. *Commonwealth v. Wareham*, 259 Pa.Super. 527, 393 A.2d 951 (1978). However, in making its determination, the lower court must exercise its discretion within certain procedural limits. The sentencing court must consider the pertinent facts and the force of the evidence, and must not commit an error of law or inflict punishment exceeding that prescribed by statute.[11] *Commonwealth v. Knight*, 479 Pa. 209, 387 A.2d 1297 (1978). The judge must have accurate information including a presentence report when required, he must consider the character of the defendant and the particular circumstances of the offense, *Commonwealth v. Martin*, 466 Pa. 118, 351 A.2d 650 (1976), and he must make his reasons for imposition of the particular sentence clear on the record. *Commonwealth v. Kostka*, 475 Pa. 85, 379 A.2d 884 (1977); *Commonwealth v. Riggins*, 474 Pa. 115, 377 A.2d 140 (1977). Additionally, the sentence imposed should be the minimum consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant. *See* 18 Pa.C.S. § 1321(b) (Supp.1980); *Commonwealth v. Martin, supra*; ABA Project on Minimum Standards of Justice, Standards Relating to Sentencing Alternatives and Procedures, § 2.2 (Approved Draft 1968).

In sentencing appellant, the sentencing judge considered, *inter alia*,[12] a presentence report, the character and

11. Appellant does not question the legality of his sentence, nor could he, since the sentence imposed was substantially less than the maximum permitted by statute. *See* 18 Pa.C.S. §§ 1101(3), 1104(1).

12. Although the sentencing court did not refer specifically to the guidelines contained in the Sentencing Code, Act of December 30, 1974, P.L. 1052, No. 345, 18 Pa.C.S. §§ 1301 *et seq.*, it is clear from the record that the court's expressed considerations were consistent with those guidelines. While the better practice may be to refer specifically to the sentencing guidelines when imposing sentence, there is no requirement that the record reflect such enumeration. *See Commonwealth v. Doyle*, 275 Pa.Super. 363, 418 A.2d 1336 (1979); *Commonwealth v. Wicks*, 265 Pa.Super. 305, 401 A.2d 1223 (1979). Indeed, there was no need in the instant case for the judge to elaborate on the applicable provisions of the Sentencing Code be-

reputation of appellant, the gravity of the offense, and the particular circumstances of the crime. The record discloses that the sentencing judge was particularly concerned with the seriousness of appellant's actions, since they resulted in the loss of a life. Furthermore, the judge noted appellant's apparent lack of remorse, as evidenced by certain responses given by appellant during the presentence investigation. Noting that appellant's counsel's arguments for probation were persuasive, the judge nevertheless concluded that the seriousness of the offense dictated the term of imprisonment imposed. Our review of the record supports the conclusion of the sentencing judge, and we find that he adequately comported with the sentencing standards enunciated in *Commonwealth v. Riggins, supra,* and its progeny, and did not impose a manifestly excessive sentence.

Accordingly, the judgment of sentence is affirmed.

CAVANAUGH, J., concurs in the result.

cause appellant's counsel read many of those provisions to the court prior to imposition of sentence. *See* N.T. Sentencing Hearing 10–12.