471 A.2d 1246

**COMMONWEALTH of Pennsylvania**

v.

**Stephen SHAIN, Appellant.**

Superior Court of Pennsylvania.

Submitted Oct. 3, 1983.

Filed Jan. 20, 1984.

Petition for Allowance of Appeal Denied June 7, 1984.

458

460

John Paul Curran, Philadelphia, for appellant.

Jane Cutler Greenspan, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, President Judge, and HESTER and LIPEZ, JJ.

HESTER, Judge:

At approximately 2:00 p.m. on November 9, 1977, the body of Edward Hammond was discovered lying face down in a pool of water in a heavily weeded area near 62nd Street and Woodland Avenue, in the City of Philadelphia. The victim was a male, 5'5" in height, weighing 129 lbs., and had received fifty-seven (57) stab wounds to the back, neck and shoulder areas. At approximately 3:30 a.m. on November 9, 1977, prior to the discovery of the victim's body, appellant, who was living with his uncle less than three blocks from the murder scene, woke his uncle and confessed to the killing. Appellant admitted repeatedly stabbing an individual earlier that night. Later during the day after receiving further information which established a killing had in fact occurred, appellant's uncle went to the police and reported what he had been told by appellant. Appellant was subsequently arrested for this crime and charged with murder, voluntary and involuntary manslaughter, and possession of an instrument of crime. Following his first trial, a jury convicted appellant of murder in the first degree and possession of an instrument of crime. Post verdict motions were denied and appellant was sentenced to life imprisonment on the murder conviction and to a concurrent term of two and one-half to five years imprisonment on the weapons offense. The judgments of sentence were appealed to our Supreme Court. The Supreme Court affirmed the possession of an instrument of crime judgment but reversed the murder judgment and granted a new trial for reasons not

relevant to the instant appeal. *Commonwealth v. Shain*, 493 Pa. 360, 426 A.2d 589 (1981).

On July 14, 1981, appellant was retried before a jury and found guilty of third degree murder. Following denial of his post trial motions for a new trial and arrest of judgment, appellant was sentenced to imprisonment for a term of not less than ten nor more than twenty years, consecutive to any other sentence he was serving. Appellant raises three issues in this appeal.

Appellant first contends that the trial court erred in admitting testimony referring to the victim as "retarded". The testimony of which appellant complains was elicited from the victim's brother-in-law, Joseph Gallagher, and from appellant's uncle, James Morrow. At trial, Gallagher testified:

Q. Okay. What was your brother-in-law's mental condition at that time?

A. It was retarded.

Q. Now I want to—don't just make a mental diagnosis for the jury. I want you to describe in your own words, as best you can, what you mean when you say that your brother-in-law was retarded?

MR. CURRAN: Your Honor. I'd like my objection noted, please.

THE COURT: It has been.

THE WITNESS: Well, he could neither read nor write. He had no formal education. He spent eight years from (sic) the State Mental Hospital, upstate New York.

He couldn't count money. Just about all he was capable of doing was small tasks and going to the store.

.    .    .    .    .

Q. Would you describe your brother-in-law's physical appearance; how big was he; how much did he weigh —approximately?

A. Well, he was about 5'5", 120 pounds, slender build, and real thin arms. He was about the strength of a young girl.

(N.T. 7/15/81, pp. 52–53).

Appellant's uncle, James Morrow, testified that after he was made aware of the victim's retarded mental condition the day following the murder he confronted appellant with this fact. He asked appellant:

Q. What did you say to [appellant]?

A. Well, he was upstairs in the front bedroom. I asked him—I said, "Is that true, you killed that guy?"

Q. Okay. Did you refer to him as "that guy?"

A. Yeah.

Q. Did you refer to him as "retarded?"

A. Retarded.

. . . . .

Q. What did the defendant say when you asked him that question?

A. He said, "The hell with him."

(N.T. 7/15/81, p. 71).

Appellant insists these references to the victim's retarded mental condition were irrelevant, prejudicial and required expert testimony.

■■■ As a general rule, the admission and exclusion of evidence is a matter within the discretion of the trial judge. *Commonwealth v. Krajci*, 283 Pa.Super. 488, 424 A.2d 914 (1981). An abuse of that discretion may be found if it appears that a trial judge admitted irrelevant evidence that was prejudicial to the accused or evidence the probative value of which was outweighed by its prejudicial impact or its tendency to suggest decision on an improper basis. *Id.* Thus, we must evaluate the relevancy of the testimony admitted with regard to the victim's mental condition and weigh its relevancy against its prejudicial impact.

■■■ Evidence is relevant if it tends to make more or less probable the existence of some fact material to the case, it tends to establish facts in issue or when it in some degree

advances the inquiry and thus has probative value. *Commonwealth v. Sinwell*, 311 Pa.Super. 419, 457 A.2d 957 (1983); *Commonwealth v. Krajci*, supra.

█ It will be recalled that the murder occurred in the middle of the night in a dark, weeded area near a shopping center. According to appellant's own statements, he and his acquaintances met the victim, whom they did not know, at the top of a hill. The victim then willingly accompanied appellant and the other individuals down a ramp to a point where he was eventually stabbed to death.

The reference to the retarded, mental condition of the victim by Gallagher, the victim's brother-in-law, describes the victim. While the description of the victim's mental condition, or his institutional commitment, is of little probative value in and of itself, Gallagher's reference does tend to explain the victim's willing presence at the scene and how appellant may have lured the victim down the ramp behind the shopping center to where he was killed. Thus, in this respect, the description of the victim, including reference to his mental deficiencies, was relevant.

The reference to the victim as retarded, which emanated from the dialogue between Morrow and appellant, was also relevant. The reference in the context in which it was made linked the occurrence of the killing with appellant's criminality; it also tended to establish appellant's culpability and his callous state of mind.

Further, each reference was relevant to rebut appellant's claim that he acted in self-defense. In each of appellant's statements given to police prior to the first trial and admitted at the second trial, appellant stated that the victim slapped him in the face immediately prior to the stabbing (N.T. 7/15/81, pp. 97, 101, 110). Appellant's testimony given at the first trial, which also was admitted during the second trial, indicated that appellant was punched in the back of the head by someone whom he did not see. (N.T. 7/16/81, p. 26). In defense counsel's closing argument to the jury, these statements were argued, along with appel-

lant's earlier testimony that he had been stabbed a few weeks earlier while working the night shift as a security guard, to support a self-defense claim. Under these circumstances, evidence of the victim's retarded mental condition, in addition to his diminutive size, was highly relevant to meet this claim and also the issue of provocation. On balance then, we conclude that the references respecting the victim's mental condition were of probative value and therefore relevant. We also conclude the individual probative value of each reference outweighs any possible prejudicial impact that may have been suffered by appellant as a result of that reference.

■ Appellant complains that there was prejudice of the variety that may inflame or unjustly arouse the jury such that it would cause the jury to base its decision on something other than the legal propositions relevant to the case. We find no prejudice of this nature suffered by appellant by reason of the references to the victim's mental condition. Furthermore, appellant's counsel and the trial court were aware of this potential problem at trial and agreed that any possible prejudice could be rectified by an appropriate jury instruction. (N.T. 7/15/81, p. 51). This was done by the trial court in charging the jury, "[y]ou may not speculate or conjecture. You may not guess. You may not rely on sympathy for the defendant or the alleged victim, nor prejudice against any party involved in this case." (N.T. 7/17/81, p. 2). Appellant's counsel indicated no dissatisfaction with this instruction or suggested any embellishment of it. We are persuaded that any potential prejudicial harm which may have resulted was minimized by the instruction. See *Commonwealth v. Youngkin*, 285 Pa.Super. 417, 427 A.2d 1356 (1981); *Commonwealth v. Watson*, 269 Pa.Super. 285, 409 A.2d 891 (1979). Thus, the references to victim's retarded mental condition were properly admitted.

■ Appellant complains that Gallagher's reference to the victim's condition as "retarded" was improper, and that expert medical testimony was required to justify characterizing the victim. We disagree. Gallagher was competent

to express his opinion as to the mental capabilities and limitations of the victim. See *Commonwealth v. Knight*, 469 Pa. 57, 364 A.2d 902 (1976); *Commonwealth v. Young*, 276 Pa.Super. 409, 419 A.2d 523 (1980).

■ Appellant next alleges that several remarks made by the prosecutor in his summation improperly expressed his personal opinion of appellant's guilt and disparaged his counsel's trial strategy. The remarks of which appellant complains, stated in appellant's brief and in many respects taken out of context are:

I sit here and I listen to cases as I put them on and I don't get personally involved... I listen to what Mr. Curran just said to you and I say to yourselves [sic], 'But that's not what the evidence was...' It's sort of like a shotgun approach, throwing a psychia-trist here who never examined the defendant ...' throw in a woman who still loves the defendant and, obviously, has problems; make an argument for the jury to hear... (N.T. 7/16/81, p. 174).

... you found out that there is this allegation he [Morrow] was interested in the defendant's girlfriend and therefore, "hey, what the heck. I might as well pin a murder on the guy. (N.T. 7/16/81, p. 175).

It's like the old game, "Three-card rummy," it is called and I'll darn fool you. (N.T. 7/16/81, p. 176).

What in God's name, does that show you about whether or not Stephen Shain was drunk?

... I want you to think, how a man, who was supposed to be as intoxicated as Mr. Curran wants you to believe, can find his way home ... wash the knife... (N.T. 7/16/81, p. 179).

What did Dr. Michaels say? (N.T. 7/16/81, p. 180) ... so he didn't tell you anything, didn't add a damn thing to this case; so why is he here? (N.T. 7/16/81, p. 181).

Why is he here, to influence you, to get you to feel sympathy for a poor man who was allegedly drunk when he knifed a man to death?

Do you believe it for one second? (N.T. 7/16/81, p. 181).

466

Self-defense—what are you kidding? (N.T. 7/16/81, p. 181).

It was his knife. The man was stabbed in the back, ladies and gentlemen—in the back. (N.T. 7/16/81, p. 182).

Well, involuntary manslaughter ... I think, ladies and gentlemen, you would be very hard-pressed to find that a man accidentally fell on a knife fifty-seven times. That might be a little difficult for some of you people to swallow. (N.T. 7/16/81, p. 183).

If you believe that this man had any kind of belief in self-defense and that's why he stabbed the man, raise your hand. I'll sit still and shut up and sit down. I won't even waste my time. (N.T. 7/16/81, p. 184).

Third degree... Now, I want to know if any one of you jurors could go back in that room and say with a straight face that Stephen Shain did not intend to kill Edward Hammond—once in the arm maybe, okay. (N.T. 7/16/81, p. 184).

Now—now, we get to first degree murder... You say to convict this man of first degree murder, you have to believe that Stephen Shain went out that night with the intent to kill somebody? Bull. The law says ... a fraction of a second... (N.T. 7/16/81, p. 185).

We have a great system in the country where a defendant is given many, many rights...he's presumed innocent... The cloak of innocence on his shoulders. Ladies and gentlemen, I want you to go back in that Jury Room and decide this case on the evidence, not on your feeling. Rip that cloak off of Stephen Shain and say "Mr. Shain, we know what you did... You stabbed a man to death intentionally... It's first degree murder." (N.T. 7/16/81, p. 187).

Appellant's counsel objected to these statements neither during nor at the end of summation, despite the trial judge's reminder to do so, nor for that matter, did he challenge these remarks in his written post verdict motions. Therefore, these remarks have not been preserved for our

review. *Commonwealth v. Butts,* 495 Pa. 528, 434 A.2d 1216 (1981); *Commonwealth v. Jarvis,* 482 Pa. 598, 394 A.2d 483 (1978); *Commonwealth v. Basile,* 312 Pa.Super. 206, 458 A.2d 587 (1983); *Commonwealth v. Youngkin,* 285 Pa.Super. 417, 427 A.2d 1356 (1981).

Appellant also complains that the prosecutor impermissibly challenged the jury to return anything but a verdict of first degree murder when he stated:

> Don't compromise. Don't come back here and say, "voluntary" or "third". Find the guy not guilty, if your [sic] going to do it. Because if you don't have the guts and you don't have the courage, you don't belong where you are. (N.T. 7/16/81, p. 188).

Appellant's counsel also failed to preserve this objection for appellate review since he objected to this remark neither during nor at the end of summation, nor, for that matter, did he challenge it in his written post verdict motions.[1] *Commonwealth v. Butts,* supra; *Commonwealth v. Jarvis,* supra; *Commonwealth v. Basile,* supra; *Commonwealth v. Youngkin,* supra.

1. Although appellant apparently contested this specific remark at the sentence hearing some eight months subsequent to the filing of his written motions; in order to preserve an issue for appellant review, a timely specific objection at trial must be made and the issue must be raised in written post trial motions. *Commonwealth v. Butts,* supra; *Commonwealth v. Parker,* 494 Pa. 196, 431 A.2d 216 (1981); *Commonwealth v. Austin,* 484 Pa. 56, 398 A.2d 941 (1979); *Commonwealth v. Blair,* 460 Pa. 31, 331 A.2d 213 (1975). The fact that the lower court may have considered an orally presented allegation will not suffice to preserve allegations for appellate review. *Commonwealth v. Philpot,* 491 Pa. 598, 600, 421 A.2d 1046, 1047 (1980). See also, *Commonwealth v. Vitacolonna,* 297 Pa.Super. 284, 443 A.2d 838 (1982). We further note that any issue with regard to prosecutorial misconduct on cross-examination was also waived by reason of failure to specifically raise such claim in post trial motions. The fact that the lower court gave this some consideration in its opinion in support of denying appellant's motions is not of consequence. *Commonwealth v. Philpot,* supra. We further note that, notwithstanding the fact that appellant's motions contained a notation that appellant would submit other points of error within a reasonable time after the record was completed, appellant made no effort to offer an amendment or supplement the original motions.

Appellant's final claim concerns the inconsistency in the verdict. After returning from its deliberation, the jury announced its verdict of third degree murder, and the court ordered the verdict to be recorded. The trial judge then requested the verdict report from the foreperson. The report indicated a finding of both murder in the third degree and voluntary manslaughter. The trial court, after ascertaining that these verdicts were not typographical errors, informed the jury that the verdict was improper. The jury then retired and returned a proper verdict, finding appellant guilty of murder in the third degree. Appellant's counsel requested that the jury be polled. All the jurors were polled, and the verdict of third degree murder was recorded.

In essence, appellant's claim is that the "recording" of the third degree verdict, which occurred prior to the discovery of the inconsistency with the verdict of voluntary manslaughter on the verdict sheet, dissuaded the jury from returning a verdict of voluntary manslaughter only. This issue has not been preserved for our review since any disagreement with the manner in which the verdict was rendered was neither objected to at trial nor included in appellant's written post trial motions.[2] *Commonwealth v. Butts*, supra; *Commonwealth v. Parker*, 494 Pa. 196, 431 A.2d 216 (1981); *Commonwealth v. Austin*, 484 Pa. 56, 398 A.2d 941 (1979). In any event, the trial judge, in an effort to correct any inconsistency in the verdict, acted properly when he directed the jury to retire and reconsider its verdict. *Commonwealth v. Brightwell*, 479 Pa. 541, 547, 388 A.2d 1063, 1066 (1978), cert. denied, 439 U.S. 989, 99 S.Ct. 588, 58 L.Ed.2d 664; *Commonwealth v. Johnson*, 369 Pa. 120, 85 A.2d 171 (1952); *Commonwealth v. Micuso*, 273 Pa. 474, 117 A. 211 (1922). Following their re-deliberation and the return of the verdict of third degree murder, the

2. This issue was orally presented at argument of the post trial motions, and notwithstanding the lower court consideration of it in its opinion, the issue is not properly before us since it was not raised in the written post-trial motions. See *Commonwealth v. Philpot*, supra.

jury members were individually polled and the proper verdict was recorded.

Judgment of sentence affirmed.