**Commonwealth v. Byers**

C.P. of Venango County, C.R. no. 359-1999.

*Richard A. Linzer, senior deputy attorney general,* for plaintiff.

*Michael Rusenfield,* for defendants Byers.

*Raymond A. Bogaty,* for defendant Stitt.

*Peter F. Vaira,* for Pennsylvania Medical Society, amicus curie.

WHITE, *P.J.*, December 16, 1999—

## 1. PROCEDURAL HISTORY

We have for consideration defendants' motions to quash and/or petitions for habeas corpus. After careful review of the testimony via the transcripts of the preliminary hearing, the adjudication and order of the hearing examiner for the State Board of Medicine, the adjudication and order of the State Board of Medicine, the motions filed by the defendants, the response in each case filed by the Commonwealth, and the briefs by the parties for and against the motion, the amicus curiae brief submitted by the Pennsylvania Medical Society, and the arguments of counsel, the motions will be granted in part and denied in part.

All of the defendants in this matter were doctors employed by the Pennsylvania Department of Public Welfare at Polk Center in Venango County at the time of the alleged conduct. Polk Center is a residential treatment facility for severely to profoundly mentally retarded and developmentally disabled individuals. All of the victims in these cases were patients at Polk Center. All of the defendants were initially charged with neglect of care of a dependent person, 18 Pa.C.S. §2713, however, the district justice dismissed all of the counts brought under that section as it was determined by the district justice that that section did not become law until June of 1997 and, therefore, the conduct charged predated the act and it did not apply.

There are remaining three different charges against the five physicians. Simple assault, 18 Pa.C.S. §2701(a)(1),

as to all five physicians for stapling patients without anesthesia. Recklessly endangering, 18 Pa.C.S. §2705, as to two of the physicians, Doctors Byers and Miranda, for reckless failure to treat and a charge of involuntary manslaughter, 18 Pa.C.S. §2504, as to Dr. Miranda. All five defendants filed petitions for habeas corpus before this judge and four of the defendants (all but Doctor Stitt) did file a motion to quash the information. In all instances, the cases are prosecuted by the Commonwealth Attorney General.

The matter was argued before this judge on June 21, 1999. The Pennsylvania Medical Society was permitted to, and did, file an amicus curiae brief. The court also considered, as both sides briefed and argued, the findings, conclusions and order of the hearing examiner for the State Board of Medicine dated April 12, 1999. The adjudication and order of the State Board of Medicine, dated October 29, 1999, was submitted to the court by defense counsel on November 1, 1999. The Commonwealth has not objected to the submission of the final adjudication of the State Board of Medicine to the court, therefore, based on Pa.R.E. 201, the court will take judicial notice of the state board's actions. These actions are the culmination of the hearing examiner's findings and conclusions which are already part of the record in this case. The adjudications and orders are not subject to reasonable dispute because they are capable of accurate and ready determination by sources whose accuracy cannot be reasonably questioned. Pa.R.E. 201(b). A court can take judicial notice without being asked, Pa.R.E. 201(c), and judicial notice can be taken at any stage of the proceeding. Pa.R.E. 201(f).

Based on our reading of the briefs and arguments of counsel, the material facts read in the light most favorable to the Commonwealth's theory of the individual cases are not seriously in dispute. There are not significant distinctions between our reading of the preliminary hearing transcripts and the findings of fact made by the hearing examiner. We, therefore have considered the findings of fact made by the hearing examiner, Frank C. Kahoe in the same light as we considered the preliminary hearing transcripts.

## 2. DISCUSSION

In order to defeat a motion to quash or a petition for habeas corpus, the Commonwealth must establish a prima facie case against the accused. *Commonwealth v. Fox,* 422 Pa. Super. 224, 619 A.2d 327 (1993), *alloc. denied,* 535 Pa. 659, 634 A.2d 222 (1993). The sufficiency of proof standard used to establish a prima facie case is that the nature and quality of the evidence, if accepted as true, would allow the case to go to a jury. *Commonwealth v. Wojdak,* 502 Pa. 359, 466 A.2d 991 (1983); *Commonwealth ex rel. Scolio v. Hess,* 149 Pa. Super. 371, 27 A.2d 705 (1942). The Commonwealth's burden is to show in the prima facie case that a crime has been committed and that there is sufficient probable cause to believe the accused committed the offense. *Commonwealth v. McBride,* 528 Pa. 153, 595 A.2d 589 (1991). The Commonwealth must introduce evidence to support that each element of every offense charged is present in their case. *Commonwealth v. Wojdak,* 502 Pa. 359, 466 A.2d 991 (1983); *Commonwealth v. Owen,* 397 Pa. Super. 507, 580 A.2d 412 (1990). Proof of guilt beyond a reasonable

doubt is not necessary. *Commonwealth v. Owen,* 397 Pa. Super. 507, 580 A.2d 412 (1990). The court should make all reasonable inferences drawn from the evidence which support a verdict of guilty and the evidence should be read in the light most favorable to the Commonwealth. *Commonwealth v. Owen,* 397 Pa. Super. 507, 580 A.2d 412 (1990).

In the informations filed against all five defendants, the Commonwealth alleges three forms of culpable conduct, that is, intentionally, knowingly, and recklessly. At page 12 of its brief, however, the Commonwealth asserts only one form of culpable conduct, recklessness. We, therefore, conclude that the Commonwealth has abandoned any theory of intentional or knowing assault and is relying entirely upon the theory of recklessness in the assault cases.

## 3. SIMPLE ASSAULT CHARGES

As it pertains to the facts elicited in these cases, the Pennsylvania Legislature has defined simple assault as:

"A person is guilty of assault if he:

"(1) recklessly causes bodily injury to another. . . ." 18 Pa.C.S. §2701.

Bodily injury is defined as an impairment of physical condition or substantial pain. 18 Pa.C.S. §2301. The Commonwealth has not shown any impairment of the patients' physical condition, so it contends there was substantial pain to the residents. "Substantial pain may be inferred from the circumstances surrounding the physical force used, even in the absence of significant injury."

*Commonwealth v. Richardson,* 431 Pa. Super. 496, 499, 636 A.2d 1195, 1196 (1994) (citing *Commonwealth v. Ogin,* 373 Pa. Super. 116, 540 A.2d 549 (1988) (en banc), *alloc. denied,* 521 Pa. 611, 557 A.2d 343 (1989); see also, *Commonwealth v. Jorgenson,* 341 Pa. Super. 550, 492 A.2d 2 (1985), *rev'd on other grounds,* 512 Pa. 601, 517 A.2d 1287 (1986) (jury may infer that striking a person twice on the face causes pain even without testimony regarding pain). The definition of "bodily injury" is stated generally. As the court in *Wertelet, infra,* stated, "[a]lthough not necessarily controlling, the connotation of bodily injury, a sort of common person understanding of the term, suggests a physical event unlike those commonly occurring in normal life which, although unpleasant and somewhat painful, do not seriously interrupt one's daily life. Thus, if one cuts oneself shaving the average person does not think that he has suffered an injury even though such an event could be accompanied by some pain and bloodshed. Similarly, if one stubbed a toe or dropped something on it, even though it could elicit a fair amount of pain and might even result in some limping and the ultimate loss of a toenail, one would not think of himself as 'injured.' " *Commonwealth v. Wertelet,* 696 A.2d 206, 210 (Pa. Super. 1997). That point is also made in *Commonwealth v. Kirkwood, infra,* which also states "the assault section of the Crimes Code was intended to protect and preserve one's physical well-being and was not intended to prevent temporary hurts resulting from trivial contacts which are a customary part of modern day living." *Id.,* 360 Pa. Super. 270, 275, 520 A.2d 451, 454 (1987).

Dr. Stitt is charged with two counts of simple assault. It is alleged in Count 1 that on January 30, 1996, he placed

five staples in a patient without anesthesia and in Count 2, it is alleged he placed four staples in a patient without anesthesia. The doctor coaxed the patient, offered the patient anesthesia and the patient consented to the procedure but without anesthesia. It is clear the doctor made a judgment that, under the circumstances, he would go ahead without the anesthesia. In all cases, the Commonwealth presented the testimony of James Holliman M.D., who expressed his opinion that placing more than one staple without anesthesia was a gross deviation of the standard of care. (Dr. Stitt, preliminary hearing transcript, testimony of Dr. Holliman, March 30, 1999, p. 6 and pp. 34-35.)

Dr. Louka Makkar is charged with two counts of simple assault. It is alleged that on November 26, 1995, he placed three staples in a resident without anesthesia and on June 1, 1996, he placed four staples without anesthesia. In front of the hearing examiner, it was established that Dr. Makkar placed staples without anesthesia because of this patient's dramatic jerking which occurred during medical treatment or medical procedures. The one flap injury to be closed was in close proximity to the patient's eye. Dr. Makkar was reluctant to use a needle. The stapling took 20 to 30 seconds. (Hearing officer's findings, 6 through 15.) The other patient was very combative. In both cases, Dr. Holliman was of the opinion that the conduct of Dr. Makkar in stapling the injuries without anesthesia was a "gross deviation from the standard of care." (Dr. Holliman's testimony, preliminary hearing, March 30, *Commonwealth v. Makkar,* p. 5.)

In the case of Dr. Moussa, there are eight counts of simple assault, seven involving charges of stapling with-

out the use of anesthesia. In Count 7, Dr. Moussa administered 11 sutures without anesthesia. In Count 8, he administered three staples without anesthesia and in Counts 1 and 5, he administered four staples without anesthesia. Significantly, the hearing examiner for the State Board of Medicine found that six staples without anesthesia fell below the standard. In the case where Dr. Moussa applied 11 sutures without anesthesia, the testimony before the hearing examiner was that the patient would not consent to anesthesia but Dr. Moussa was able to communicate with the patient. As the patient indicated he did not want the anesthesia, Dr. Moussa then offered the patient a dollar to purchase a sweet roll if the patient would allow the doctor to inject. The patient again refused. Dr. Moussa then offered the patient a dollar if he could close his wound without anesthesia, showing him a needle and the patient agreed. The doctor closed the wound with 11 sutures without anesthesia, the patient cooperated, after which the doctor gave the patient a dollar to buy a sweet roll. The hearing examiner in Dr. Moussa's case determined that 11 sutures without anesthesia was excessive and violated the standard. The hearing examiner recommended public reprimand. The State Board of Medicine dismissed all charges before the board relating to closing lacerations without anesthetic.

Dr. David Byers is charged in Counts 2 through 9 with inserting four to 15 surgical staples in seven different patients on seven different occasions without anesthesia. Dr. Holliman testified that in each instance placing the staples without local anesthesia was a gross deviation from the standard of care.

Dr. Cesar Miranda, in Counts 4 and 5, is charged with simple assault in placing three surgical staples two times on July 26, 1996, and August 22, 1996, without the use of anesthesia. Dr. Holliman, at pages 5, 11 and 12 of the transcript of the March 30, 1999, Dr. Miranda hearing, stated it was his opinion that closing the wound with staples without anesthesia was a gross deviation of the standard of care.

Our reading of the transcripts of the preliminary hearing and the findings and conclusions of the hearing examiner and of the State Board of Medicine causes us to conclude that in the instance of closing the wounds with staples without anesthesia that not one of the defendants was shown to be acting with an intent to hurt the patients. On the contrary, the defendants were attempting to treat the injury and as quickly as possible, close the wound and help alleviate the pain the residents were feeling because of their injuries. The doctors, from the evidence, believed and intended that their actions would help heal the patients and not harm them more.

To find that the defendants acted recklessly, the court must find that they consciously disregarded a substantial or unjustifiable risk that the bodily injury would result from their actions. The risk and nature of their actions must disregard the risk to the level of gross deviation from the standard of care that a reasonable person would observe in the actor's situation. Pa. Standard Criminal Jury Instructions §15.2071(b). Clearly from the evidence, the physicians did not consciously disregard any risk to the residents. According to the findings of the hearing officer, they weighed the benefits of closing the lacerations quickly, even the Commonwealth's expert, Dr.

Holliman, repeatedly testified that one of the benefits of using staples is that the wounds are more quickly closed. (See Byers' preliminary hearing, March 30, 1999, testimony of Dr. Holliman, pp. 4 and 20.) Contrasting that is the injection of local anesthesia or the application of a topical anesthesia, where the anesthesia is applied or injected, and then there is a wait while the anesthesia takes effect. In many cases, such as this, the hearing examiner found there were risks attendant to anesthesia, such as sticking a needle near the patient's eye when the patient has a history of actively resisting treatment. Many of the patients thrashed about even while restrained and the thrashing creates an independent risk of further harm to the patient. Certainly, in some instances, there is a greater risk of harm, such as fractures and dislocations, than the initial injury of a laceration. Also, there was the added risk of injury to the attending staff and to the physician. (See conclusions of hearing examiner, pp. 27 through 34.) We note that the hearing examiner was not persuaded as to Dr. Moussa's decision to close a wound with 11 sutures without anesthesia. (Conclusion of hearing examiner, pp. 33 and 34.) In two other cases, the hearing examiner concluded that Dr. Moussa inappropriately used staples without anesthesia. The hearing examiner in this case concluded that Dr. Moussa's errors were errors in judgment but were not made with any disregard of the interests of his patients. Rather, the hearing examiner found that Dr. Moussa, despite these instances, acted with the best interests of his patients in mind. As we noted above, however, the State Board of Medicine instead, concluded that Dr. Moussa's conduct did adhere to minimum standards of acceptable practice.

We recognize as we discuss these facts, that we are considering some favorable evidence presented from the defendants at the adjudication, by the hearing examiner and State Board of Medicine which would not normally be made available to us in the context of a motion to quash or a habeas corpus petition. We are satisfied, under the circumstances, that the Commonwealth has covered the elements with regard to the offense of simple assault in the suture and staple cases. In each case, Dr. Holliman testified that the closing of wounds without anesthesia was a gross deviation from the accepted standard. Whether the Commonwealth has shown "impairment of physical condition or substantial pain" as required in the definition of bodily injury under section 2301 of the Crimes Code is problematic. It is hard to think of a staple or suture as being an injury. Nevertheless, applying the standards that we must in a motion to quash or habeas corpus petition, Dr. Holliman's testimony is some credible evidence of recklessness and there is some evidence of substantial pain. The Commonwealth has covered the elements that each of the defendants, by stapling or suturing without anesthesia, caused bodily injury to the victims. Our Superior Court, in the context of a physician treating a patient, has equated recklessness to treatment and conduct by a physician with regard to a patient which is termed irresponsible and totally inappropriate in the circumstances. *Commonwealth v. Youngkin,* 285 Pa. Super. 417, 427, 427 A.2d 1356, 1361 (1981). Applying *Youngkin,* the Commonwealth presented a prima facie case.

We are persuaded, however, with regard to the stapling and suture simple assaults charged by the defen-

dants' assertion of the defense of de minimis under section 312 of the Crimes Code, 18 Pa.C.S. §312.

"(a) General rule.—The court shall dismiss a prosecution if, having regard to the nature of the conduct charged to constitute an offense and the nature of the attendant circumstances, it finds that the conduct of the defendant:

"(1) was within a customary license or tolerance, neither expressly negatived by the person whose interest was infringed nor inconsistent with the purpose of the law defining the offense;

"(2) did not actually cause or threaten the harm or evil sought to be prevented by the law defining the offense or did so only to an extent too trivial to warrant the condemnation of conviction; or

"(3) presents such other extenuations that it cannot reasonably be regarded as envisaged by the General Assembly or other authority in forbidding the offense." 18 Pa.C.S. §312.

Whether charges should be dismissed as de minimis is directed to the sound discretion of the trial court. *Commonwealth v. Eliason,* 353 Pa. Super. 321, 509 A.2d 1296 (1986). This judge historically has given deference to the prosecuting attorney (district attorney in most instances; however, in this instance, the attorney general) in deciding which cases to bring into court. In this case, we are satisfied as to all counts, that the Commonwealth has established a prima facie case (that is, covered the elements with some credible proof) and that the district justice appropriately bound these charges over. The Commonwealth's attorney is charged with assessing

cases from the perspective of the public interest, deciding which cases should be prosecuted, whether a case is provable in court, and whether it is in the public interest to proceed with the prosecution. One wonders then why this section even exists since those same concepts ultimately stand behind the de minimis section and the authority of the court to dismiss. This judge has sat in my court room literally dozens of times wondering why a particular case wound up tying up all of the time of the prosecutors, public defenders, the judge, the court room and 12 or 14 perplexed jurors when the case could have, and should have, been resolved by some more efficient means, such as at a district justice level as a summary offense. In this case, this judge has the benefit of reading the findings of the hearing examiner which presents some of the defense theory, the ultimate conclusions of the State Board of Medicine and we have the amicus curiae brief filed by the Pennsylvania Medical Society. PMS repeatedly stressed in its brief:

"PMS is not entering this case to defend the quality of care rendered by the accused physicians. Nor is PMS advocating that a physician should not be held accountable for providing sub-standard care. PMS asserts that the criminal justice system is not the appropriate forum to address honest errors in medical judgment. The appropriate forums for addressing deficient medical care are the civil tort system, the internal and external quality review mechanisms for health care facilities and the disciplinary proceedings by the physician professional licensing boards." Amicus brief at 2.

While the PMS brief is more specifically directed at the recklessly endangering and the manslaughter charges,

PMS contends generally that a physician who is exercising a medical judgment should not be subject to criminal prosecution.

"Every day across the Commonwealth, physicians routinely, consciously disregard a known risk of death or serious bodily injury when treating a seriously injured or gravely ill patient. They disregard such risks simply because they are keenly aware that if they do not take necessary but life-risking measures, they will be subjecting the patient to an even greater risk of death." Amicus brief at 7.

We certainly respect the logic presented in that brief. Essentially, if a physician can be prosecuted because another physician, using 20/20 hindsight can say it was a gross deviation from the standard of care, while other physicians will say that it is acceptable practice, then such a state of affairs may indeed have a chilling effect on the ability of physicians to take chances in what they believe is to be their best personal and professional judgment. The de minimis provision of the Crimes Code, we conclude, ultimately gives the court the authority, to be used only very circumspectly, to dismiss charges where the harm imposed is not substantially great, where the sanctions that could be imposed by the system are not so substantial and the matter can be dealt with administratively and where the costs of resources devoted to trying the case may be substantial. *Commonwealth v. Jackson,* 354 Pa. Super. 27, 510 A.2d 1389 (1986). In this case, there has already been a thorough review of the conduct of the physicians by the State Board of Medicine. Sanctions have been imposed where misconduct was found. While inserting the staples and sutures without anesthe-

sia may have been, in the position of the Commonwealth's expert, a gross deviation from the standard of care, the pain on all accounts was, at most, short-lived. The staples had the immediate effect of closing the wound promptly. The ability of a person to endure pain is singular. The unfortunate situation of these patients is that they are not in a position to give consent to any form of treatment and in many instances, they can act out, irrationally and dangerously. The danger can be to themselves or all those close by. We believe, however, that a significant percentage of any population when afforded an opportunity for a quick resolution of an injury versus a more protracted but safe and less painful resolution of an injury might very well pick the quick resolution. This is an area that is open to rational dispute. We are satisfied the evidence in this case, based upon what we have read from the findings of the hearing examiner, will be the substance of diverse expert opinion. Is it worth the expenditure of resources that these trials will take? There have already been four full days of preliminary hearing and one-half day of argument before this judge. Trials before juries may last weeks. It certainly will cost thousands of dollars, especially if we have to give positive consideration to a change of venue or venire because the case has such a high local profile. This is not a case where the trial court is exercising mercy powers, as our Superior Court surmised in *Commonwealth v. Przybyla*, 722 A.2d 183, 185 (Pa. Super. 1998) but rather, in our judgment, this case is going to take a lot of valuable court and juror time and very substantial local expense and we gravely doubt the Commonwealth can meet its burden. Our Superior Court has upheld a

trial court dismissal of charges as de minimis where the defendants were charged with prison riot, were already serving prison terms, where they have been dealt with administratively and the cost of a jury trial would be substantial. *Commonwealth v. Jackson,* 354 Pa. Super. 27, 510 A.2d 1389 (1986). The resolution of that case by the trial court closely tracks the considerations in this case. As we discussed above, the physicians in this case have been prosecuted administratively by the State Board of Medicine but were absolved for the stapling. With our crowded court docket, we conclude trying these cases would not be an efficient use of our resources. We contrast these charges with the rapes, robberies, aggravated assaults, homicides, drug cases and DUIs that we are required to address in seemingly ever growing numbers.

We now address specifically the three distinct bases for de minimis dismissal applying section 312. We seriously question whether the Commonwealth, given the state of the evidence and the findings of the State Board of Medicine, can prove that the conduct of the defendants was outside the customary license or tolerance. As to the second basis, taking into consideration that the defendant physicians were confronted with, in all instances, minor emergencies wherein they were expected to, and did, exercise judgment in the interests of their patients, we conclude that in many instances, the risk of greater injury to the patient or to those treating the patient necessitated the quickest resolution. Arguably, the injury inflicted was so trivial as not to warrant the condemnation of conviction. We do not mean to trivialize the plight of persons who are as severely handicapped as the patients in this case, but on the other hand, reading

Dr. Holliman's testimony in all five transcripts, we note that he was not really able to discern to what extent each patient had more pain with the procedure chosen by each defendant. For instance, in the case of M.R., who was a patient of Dr. Moussa's, she had spastic torticollis, which causes involuntary jerking action. Dr. Holliman acknowledged that restraining such a patient while waiting for the anesthesia to take effect could cause pain and emotional trauma. (Preliminary hearing transcript, March 30, 1999, Dr. Moussa, at pp. 18-19.) The cases also present other extenuations. For instance, some physicians are charged with assault for placing three staples while another is charged with assault for placing 15 staples. Should we draw a distinction for those only charged with three, then why not those only charged with four. The hearing examiner did seem to draw a distinction and found Dr. Moussa below the standard when he administered six staples and 11 sutures but the board concluded this was not below the standard. These differences in medical opinion, we conclude, are extenuating circumstances not envisioned by the legislature when it defined simple assault.

Another extenuating circumstance is the further invasion of privacy of these patients that will be necessitated by the public testimony about their condition, symptoms and reactions. We note that the preliminary hearing transcripts in this case use the patients' full names. What are their rights not to have their names bandied about in the context of extremely low IQs and distasteful medical conditions? Is this public show really necessary?

For all of the foregoing reasons, we will dismiss all of the counts of simple assault.

## 4. RECKLESSLY ENDANGERING AND MANSLAUGHTER CHARGES

We turn then, to the two remaining cases which are the charges of recklessly endangering, section 2705 of the Crimes Code, Count 1, brought against Dr. Byers, and recklessly endangering and involuntary manslaughter, section 2504(a) of the Crimes Code, which is Count 3 brought against Dr. Miranda. We note that the Pennsylvania Medical Society, in its brief, vigorously argues against prosecuting the physicians in this case under the charges of recklessly endangering. PMS asserts the criminal justice system is not the appropriate forum to address honest errors in medical judgment. Amicus brief at page 2. The emphasis in the brief is a physician should not be subject to criminal sanctions if they take a chance.

"The line between recklessness and aggressive medical treatment is a fine one and very difficult for a layman to discern." Amicus brief at 5.

In all three instances, however, where we see the recklessly endangering and manslaughter statutes applied in this case, the focus is not on medical judgment but on failure to treat. In essence, the physician can be accused of abandoning the patient or not taking seriously symptoms which were obviously very serious. In the case of Count 1, as to Dr. Byers, Dr. Simons' testimony establishes at least a prima facie case that Dr. Byers recklessly failed to treat the pneumonia symptoms of patient R.M. (Dr. Byers' preliminary hearing transcript, March 22, 1999, Dr. Simons, pp. 64-67.) In the case of Dr. Miranda, there are two instances where he is accused of failing to treat patients. In the case of D.C., the patient was critical

and in respiratory distress, cyanotic. Instead of treating the patient with oxygen, IV fluids and transport to an acute care medical facility, Dr. Miranda ordered x-rays. Dr. Simons testified this conduct was grossly negligent and reckless. (Dr. Simons' preliminary hearing transcript, March 22, 1999, at pp. 24-31.) As to patient E.R., who is the subject of Count 2, recklessly endangering and the manslaughter charge, Dr. Simons noted the patient had an 82.4 body temperature early on in his treatment that evening by Dr. Miranda and that such a condition is life threatening hypothermia. (Dr. Miranda's preliminary hearing transcript, April 26, 1999, Dr. Simons, p. 52.) Nevertheless, Dr. Miranda did not then transfer the patient to an acute care facility. (Dr. Miranda's preliminary hearing transcript, April 26, 1999, Dr. Simons, p. 29.) Mr. Dickert, an administrator at Polk Center, testified then when he confronted Dr. Miranda about such a low body temperature and inquired why he had not ordered the patient taken to a hospital, Dr. Miranda stated, "Someone with a temperature of 84 or 86 would be dead." (Dr. Miranda's preliminary hearing transcript, April 26, 1999, Dickert, p. 56.) Dr. Simons characterized Dr. Miranda's failure to treat as "a gross deviation from the standard of care and I would call that gross negligence and recklessness." (Dr. Miranda's preliminary hearing transcript, p. 38.)

Applying the standards for recklessness, as it pertains to physicians, which our Superior Court used in *Commonwealth v. Youngkin,* 285 Pa. Super. 417, 427 A.2d 1356 (1981), there was substantial evidence of recklessness. We contrast our decision with regard to the assault charges where the physicians were aggressively treating

the injury and made judgments whereas in the four counts remaining against Dr. Byers and Dr. Miranda, the physicians were not exercising judgment, were not aggressively treating the symptoms and, in fact, under the Commonwealth's theory, were ignoring palpably acute medical conditions. The real difference is that the recklessly endangering counts and the involuntary manslaughter involve a failure to treat which, under the circumstances, did cause substantial harm to the patient under the Commonwealth's theory, whereas in the assault cases, the physician was treating and whatever untoward pain the patient experienced was temporary.

We will deny the motions to quash and for habeas corpus in the case in the recklessly endangering counts brought against Doctors Miranda and Byers and the manslaughter count brought against Dr. Miranda.